UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
TAL PROPERTIES OF POMONA, LLC,   17 cv 02928 (CS)

            Plaintiff,

vs.

VILLAGE OF POMONA, BRETT YAGEL,
MAYOR OF THE VILLAGE OF POMONA,

            Defendants.
-----------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## STATEMENT OF FACTS

Plaintiff TAL PROPERTIES OF POMONA, LLC [hereinafter "TAL"] is a limited liability company formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district. Plaintiff Avrohom Manes is the sole owner of TAL and is an Orthodox Jew. Defendant Village of Pomona [hereinafter "the Village"] is a municipal corporation formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district. Defendant Brett Yagel [hereinafter "Yagel"] is the duly elected Mayor of the Village and, as and for the matters alleged herein, the final policy maker for defendant Village. He is sued both in his official and individual capacities. At all relevant times, defendant Doris Ullman [hereinafter "Ullman"] is and has been the duly appointed Village Attorney. She is sued in her official and individual capacities. The complained of acts by defendants Yagel and Ullman were undertaken under color of state law and their efficacy forwarded by the cloak of state authority with which they acted.

1

As plaintiff alleges that defendants discriminated against it based on religion in violation of the First and Fourteenth Amendments to the United States Constitution, this Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1331 & 1343(3) & (4) and 42 U.S.C. secs. 1983 and 1988.

In December 2015, plaintiff purchased a residential home [hereinafter "the home" or "the property"] at 22 High Mountain Road within the Village of Pomona. In January 2016, plaintiff made repairs to the property. The same month, the village building inspector, Louis Zummo [hereinafter "Zummo"], inspected the property on behalf of the village and concluded that plaintiff had completed the referenced repairs in accordance with applicable building codes and other applicable regulations and that a certificate of occupancy should issue.

During his interactions with Zummo, plaintiff's principal, Avrohom Manes, met defendants Yagel and Ullman, both of whom knew he was Jewish. Despite plaintiff's qualifying for the issuance of certificate of occupancy, defendants Yagel and Ullman directed Zummo to not issue the certificate of occupancy. Said direction violated the village's Construction Code [chapter 47-10] which *required* issuance of a certificate of occupancy where, as here, the applicant complied with applicable code requirements. Seeking to justify the village's refusal to issue the Certificate of Occupancy, defendant Mayor, acting by and through defendant Ullman, claimed that a prior owner of the property owed the Village $6,379.34 and demanded payment of said sum in exchange for issuance of the Certificate of Occupancy; at no time did the village claim that plaintiff had incurred said debt. Village law and the village code do not permit denial of a certificate of occupancy because a prior property owner had failed to satisfy a debt the village never recorded as a lien against the property by the time plaintiff purchased the same or at any time preceding its assertion of this as the basis for denial of a certificate of occupancy.

According to the Second Amended Complaint, refusing to grant a certificate of occupancy on this ground not only finds no basis in law, but it did not represent the village's general practice and was unprecedented in the village. Rather, out of animus for plaintiff based on plaintiff Manes', Manes, defendants Yagel and Ullman dictated this result to block and prevent plaintiffs from gaining benefit from their purchase of the home. By comparison, defendants Yagel and Ullman failed to take any action to collect the sum of $6,379.34 from the home's prior owner, who was not Jewish, and, on behalf of the Village, permitted that same developer's bond to lapse without collection though the developer failed to complete roads secured by said bond.

Through calendar year 2016, defendants Yagel, Ullman and the Village imposed other disparate and discriminatory conditions upon plaintiff as it sought to sell the home. Specifically, again at defendant Yagel's direction and contrary to the treatment accorded similarly-sloped and neighboring properties owned by non-Jews, the village required plaintiff to fulfill costly conditions before being permitted to grade out steep slopes on the property and thereby create usable backyard space, enhancing the value of the property. After plaintiffs submitted the grading plan, which their engineer had developed with the village engineer, defendants Yagel and Ullman pressured the village engineer to retract his approval, prompting Zummo to advise him that he would not participate in selective enforcement against the property and its owner. Despite the building inspector's position, the village continued to insist that plaintiff complete costly requirements which other similarly-situated property owners did not have to satisfy. Specifically, defendant required plaintiffs to post a bond to ensure that they did not damage their neighbor's property, a highly unusual requirement in the village, to test the compressed fill

3

they used for grading, also inconsistent with its treatment of others using such fill for similar projects. Even after plaintiffs agreed to meet this super-exemplary condition, the village constituted to reject their application and would not issue a grading permit. Due to the incomplete nature of this work, plaintiff was not able to sell the property for the price Manes expected or recoup the profit anticipated from the property. The village engineer's selective requirements, as dictated by defendants Yagel and Ullman, caused a substantial delay in the issuance of a certificate of occupancy.

The behavior cited above was consistent with advice both Zummo and the village clerk have provided Manes: defendants Yagel and Ullman advised them to give plaintiff a hard time with anything it needed because they did not like Manes.

In the late fall 2016, plaintiffs entered into a contract for the property's sale. Further demonstrating the baselessness of the claim which had delayed plaintiffs for months, the defendants dropped any claim that plaintiffs owed fees incurred by the prior property owner and have plaintiffs a certificate of occupancy without payment of this alleged debt.

Following sale of the property, the Village of Pomona threatened to withdraw the certificate of occupancy if plaintiff failed to sign an agreement acknowledging, *inter alia*, that the road accessing the property was not a village road and that its maintenance was the sole responsibility of the property owner. Requiring the signing of this agreement was again contrary to village practice, not authorized by any section of the village code and another *ultra vires* action undertaken by the village, as dictated by defendants Yagel and Ullman, to impede and complicate plaintiff's alienation of the property.

Overall, the delays in issuing the required certificate of occupancy and the discriminatory imposition of grading requirements caused plaintiff to incur a substantial loss in the sales price

for the property. But for said delays, the plaintiff would have been able to sell the property in early 2016 and have use of the proceeds so realized for other profitable business opportunities. Plaintiffs allege that the religiously-motivated discrimination to which defendants subjected them stymied them from timely proceeding with other projects and caused actual economic loss.

In engaging in the conduct set forth above, defendant Yagel repeatedly consulted with defendant Ullman, an attorney in good standing in the State of New York, shared with her his discriminatory design and enlisted her support in each of the methods he dictated to stymie and impeded plaintiff's project. Though aware that the impositions placed upon plaintiff were contrary to Village law and not authorized by any provision of the local building or zoning codes, defendant Ullman fronted for defendant Yagel, knowingly implementing and defending his discriminatory dictates and impeding plaintiff's business venture to delay alienation of the plaintiff's property.

On the basis of these factual allegations, plaintiffs allege two causes of action: By intentionally engaging in selective enforcement against plaintiff based on the religion of its principal, defendants violated the Fourteenth Amendment to the United States Constitution as made actionable by 42 U.S.C. section 1983 and by intentionally imposing harsher conditions upon plaintiff than it did upon other non-Jewish developers, defendants burdened the free exercise of the religion of plaintiff's principal in violation of the First Amendment to the United States Constitution as made actionable by 42 U.S.C. section 1983.

## LEGAL ARGUMENT

### THE SECOND AMENDED COMPLAINT CONTAINS AN INTEGRATED STATEMENT OF ACTIONS BY DEFENDANTS INTENDED TO DELAY PLAINTIFFS' RIGHTFUL ALIENATION OF THEIR PROPERTY ON THE BASIS OF THE RELIGION OF PLAINTIFF AVROHOM MANES

"[T]he Equal Protection Clause prohibits selective enforcement based upon an unjustifiable standard such as race, religion, or other arbitrary classification." See United States v. Batchelder, 442 U.S. 114, 125 n.8 (1979) (citing Oyler v. Boles, 368 U.S. 448, 456 (1962)) (emphasis added); see also United States v. Armstrong, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486, 134 L. Ed. 2d 687 (1996); Abcarian v. McDonald, 617 F.3d 931, 938 (7th Cir. 2010) (citing Engquist v. Oregon Dep't of Agriculture, 553 U.S. 591, 596 (2008); Plyler, 457 U.S. at 216-17) (stating that —[t]he Equal Protection Clause of the Fourteenth Amendment most typically reaches state action that treats a person poorly because of the person's race or other suspect classification, such as sex, national origin, religion, political affiliation, among others, or because the person has exercised a _fundamental right,' or because the person is a member of a group that is the target of irrational government discrimination‖).

"The basic purpose of section 1983 damage awards should be to compensate persons for injuries caused by the deprivation of constitutional rights." Carey v. Piphus, 435 U.S. 247, 254 (1978). Available remedies include compensatory damages for actual losses and for emotional distress caused by discriminatory conduct. Id. at 259-264.

Through this well-settled prism, we address defendants' 12(b)(6) arguments:

defendants first claim that plaintiffs have no standing to complain about any delays caused by defendants' refusal to grant a CO for nearly a year based upon plaintiff's alleged failure to pay another's debt because they did not ultimately pay that

6

debt. In addition, defendants submit that the delay caused plaintiffs was not extraordinary and that the Second Amended Complaint [hereinafter "SAC"] does not allege that the damage caused plaintiffs was "more than market fluctuations in the value of the property."

These arguments, which elide the central allegation of discrimination plainly set forth in the SAC, should be categorically rejected. According to the SAC, defendants acted out of an animosity to Manes' religion and so subjected him to a pattern of unusual and disparate conditions before issuing him a long-delayed CO. The delay, as well as the failure ever to provide a grading permit, substantially reduced the sales price of the premises, causing plaintiffs' compensatory damages recoverable under 42 U.S.C. 1983 for the violation of Fourteenth Amendment rights.

The cases defendants cite are inapposite and do not support their legal claims: Sponaugle v. First Union Mortg. Co., 40 Fed. Appx. 715, 716 (3d Cir. 2002) held that, the statutory exception memorialized in 15 U.S.C. section 1692(a)(6)(F)(iii) of the Fair Debt Collection Practices Act applied to a mortgage company, which might not be a debt collector under the FDCPA because the relevant debt was not in default at the time it was received. But this holding bears no relevance to the instant case and certainly does not establish that plaintiffs who experience business loss on account of religiously-based discrimination prohibited by the Fourteenth Amendment may not recover their losses. Likewise, defendants' claim that a plaintiff subjected to disparate conditions must tolerate these conditions for nine months before the same ripens into an equal protection violation finds no support in the case law: instead, where persons are treated disparately by government on the basis of their religion and suffer injury therefrom, their constitutional

7

rights are violated and they may gain redress. Again the defendants cite entirely inapposite "temporary takings" cases which have no saliency in light of the plaintiffs' actual claims. In Seiber v. United States, 364 F3d 1356, 1364-65 (Fed. Cir. 2004), a property owner sought compensation when the federal government failed to timely approve their timber logging application. The Federal Circuit held that the Seibers had made out a "temporary taking," but its analysis does not relate to a Fourteenth Amendment claim and is of no assistance to this court. Here, plaintiffs' SAC alleges that intentionally inflicted and unusual delays, orchestrated by the named defendants, animated by religious animus, injured them. These allegations stand unscathed against defendants' impertinent attacks.

## II. PLAINTIFFS' SAC PROVIDES DEFENDANTS SUFFICIENT NOTICE TO MAKE PLAUSIBLE PLAINTIFFS' AND PERMIT MEANINGFUL DISCOVERY

Defendants next claim that, since to prevail on a claim under 42 U.S.C. section 1983, plaintiffs must ultimately prove that certain similarly situated persons were better treated than they were based upon religion, the SAC must identify comparators. But, this Court should reject this *non sequitur*. Our courts have repeatedly recognized that a discrimination Complaint is plausible and provides adequate notice of a plaintiffs' claims where it states, in non-conclusory terms, the nature of the violations alleged, including a sufficient description of the alleged comparator to allow an assessment of plausibility and meaningful discovery. Brown v. Daikin Am. Inc.756 F.3d 219, 228-31 (2d Cir. 2014). Here, plaintiffs' SAC easily meets this standard: first, it notes that the defendants did not seek to collect a debt against the prior owner of the property plaintiffs purchased, a non-Jew, but refused to give plaintiff, a Jew, a deserved certificate of occupancy based

upon the same debt, before ultimately capitulating on this ground and issuing a CO [after a nine month delay] absent payment of the sum sought. As the identity of the prior property owner is a matter of public record, defendants' claim that he is not identified by name seems immaterial. Likewise, plaintiffs allege that defendants themselves permitted other non-Jewish property owners living on the very same street to engage in like grading projects without the onerous requirements imposed on them. Again, the specific allegations of the SAC make it plain who plaintiffs are referencing and identifying plaintiffs' neighbors at this stage of the lawsuit is not necessary to provide defendants with notice of the allegations against them. The same precise analysis applies to other disparate treatment in which defendants engaged: they did not require the same soil testing of those who engaged in such grading projects.

In response to the specific allegations of the SAC, defendants cite cases which condemn complaints which suggest a "high level of generality" between a plaintiff and alleged comparators. New York Pet Welfare Ass'n. v. City of N.Y., 143 F.Supp.3d 50, 64-65 (E.D.N.Y. 2015). However, plaintiffs' SAC does not suffer from this infirmity as it provides specifics from which any reasonable reader can conclude that the comparators are highly similarly-situated, i.e., property owners on the same road, facing similar topographic conditions, but not subjected to the same requirements as plaintiffs with regard to soil testing, bonding or grading plans and are "permitted" to engage in grading projects and create usable backyards. And, plaintiffs do not allege merely that the village officials failed to prosecute others; rather, these officials allowed non-Jews to proceed in a manner entirely distinct from the treatment accorded plaintiffs. *Cf.*, AYDM Assocs., LLC v. Town of Pamelia, 205 F.Supp.3d 252, 265 (N.D.N.Y. 2016).

Likewise, to the extent defendants now claim that the Court can dismiss this case for lack of proof of religious discrimination, the unexplained and repetitive adverse and disparate treatment alleged in the SAC is sufficient to meet the plausibility standard. Plaintiffs need not allege express discriminatory comments to even ultimately sustain a discrimination verdict and certainly need not plead such comments to plausibly assert such claims or make out a prima facie case of discrimination. See, Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir. 1988)("The allocation of burdens and imposition of presumptions in Title VII and ADEA cases recognizes the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier. Specific intent will only rarely be demonstrated by "smoking gun" proof, *see Gavalik*, 812 F.2d at 852, or by "'eyewitness' testimony as to the employer's mental processes," *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *see also Dillon v. Coles*, 746 F2d 998, 1003 (3d Cir.1984)"), Meiri v. Dacon, 759 F.2d 981 (2d Cir. 1986). Circumstantial evidence of disparate treatment suffices and to the extent defendants suggest otherwise, they misstate the law.

Defendants' further arguments do not support a motion to dismiss and depend on factual assertions they make but find no place in the SAC: as for the disparity between the plaintiffs and the prior property owner, the prior property owner failed to build a road for which he provided a bond; he owed the village $6,379.34 and the village made no effort to collect from him after he failed to complete the roads secured by the bond. Rather, the village refused to provide plaintiffs with a certificate of occupancy until he paid the sum incurred by his predecessor in title though the village never liened the

10

obligation and never provided plaintiffs any notice of the debt or its encumbrance upon the property they purchased at a foreclosure sale. See, SAC, paragraph 18. Moreover, according to the SAC, proceeding as the village did against plaintiffs was unprecedented, a specific factual allegation which the court must accept, and did not represent village practice. See, SAC, paragraph 19.

Likewise, the village's claim that the SAC provides insufficient facts to sustain a plausible claim of religious discrimination is to no avail. The SAC specifically alleges that similarly-sloped and neighboring properties on High Mountain Road were owned by non-Jews and were not put through the ringer as plaintiffs were. See, SAC, paragraph 23. The same paragraph makes clear that these property owners were permitted to "grade out sleep slopes on their property and thereby created useable backyard space, enhancing the value of their property," precisely what defendants disallowed plaintiffs from doing by imposing onerous and super-exemplary conditions. Defendants claim that the SAC does not expressly state that these neighboring property owners sought and received permits; this is false as paragraph 23 explicitly states that these property owners were permitted to engage in precisely the activity which plaintiffs were disallowed. The SAC explicitly compares the treatment plaintiffs received with "[t]he treatment afforded similarly-sloped and neighboring properties," alleging that the latter were permitted to do precisely what plaintiffs were disallowed from doing on the same terms. Likewise, paragraph 29 notes that plaintiffs were subject to "costly requirements which other similarly-situated property owns did not have to satisfy." Similarly, in describing the disparate soil testing conditions imposed, again plaintiffs compare themselves with others who used such fill for similar purposes, i.e., grading.

11

Defendants' recitation of the various steps required for a grading permit does not alter the fact that the Complaint alleges, in non-conclusory fashion, that at the end of the day the same village officials allowed neighbors facing the same steep sloped conditions to proceed on different terms than it imposed upon plaintiff. As defendants plainly can defend against this claim, they cannot be heard now to complain that the SAC, submitted before discovery, must be as detailed as a response to a motion for summary judgment when all relevant facts have been laid out and evaluated.

That the village code allowed the village to impose a bond to protect against damage to neighboring property does not settle whether disparate enforcement occurred, as the SAC alleges. Likewise, that the village could collect a fee owed on a property does not explain why the village made no enforcement efforts against the prior property owner, as is alleged, and against plaintiff.

Likewise, citation to this court's decision In the Matter of the Application of Hampshire Recreation, LLC v. Vill. of Mamaroneck, 2016 U.S. Dist. LEXIS 39496 (S.D.N.Y. March 25, 2016) is unpersuasive: there, the alleged comparators were in a different zoning classification than the putative competitors' property, a factor not relevant here; the village could properly take into account the very distinct relationship between the club and its neighbors and the comparators and theirs, another factor not relevant here. On the contrary, here the SAC makes abundantly clear that similarly graded properties neighboring plaintiffs' and owned by non-Jews were treated more favorably than was plaintiffs' in a myriad of ways. There are no zoning or slope distinctions to point out, which is, of course, the entire point. Moreover, as alleged, the village engineer did assent to the plaintiffs' grading plan only to be overruled by the

Mayor and counsel who acted out of animus toward plaintiffs. Moreover, <u>Hampshire Recreation</u> was not a case based upon equal protection claims or religious discrimination and did not include allegations that the building inspector himself had expressly refused to participate in selective enforcement and had advised the plaintiffs of the antipathy toward him by the individual defendants.

### III. **QUALIFIED IMMUNITY SHOULD BE DENIED**

If, as is plausibly alleged, the individual defendants waged war against plaintiffs on account of Manes' religion, they would have no qualified immunity. Defendants themselves cite settled and clearly established precedent which has long forbidden such religiously-based discrimination in and through the exercise of zoning. <u>Lisa's Party City, Inc. v. Town of Henrietta,</u> 185 F.3rd 12, 16 (2d Cir. 199), quoting <u>LaTrieste Restaurant & Cabaret Inc. v. Village of Portchester,</u> 40 F.3d 587, 590 (2d Cir. 1994). Defendants argue that what they did was 'objectively reasonable," but this depends on disputed facts and the Court cannot resolve those facts on this motion. In this context and in light of the allegations set forth in the SAC, qualified immunity cannot be extended to defendants Yagel or Ullman.

### IV. **THE INDIVIDUALS ACTED FOR THE MUNICIPALITY**

As amply set forth in the SAC, the individual defendants effectively controlled land use decisions and overruled the decisions of those authorized by statute to act for and represent the municipality. Thus, though the Building Inspector is authorized to issue a certificate of occupancy, on the alleged facts and out of animus, defendants Yagel and Ullman interfered and disallowed him to do so. Likewise, while the village engineer has the authority to reach a grading agreement with the applicant and present the same to

13

the Planning Board, the individual defendants again interfered and imposed their own conditions upon the plaintiffs in an allegedly disparate manner.

Contrary to defendants' claim, a single incident may constitute an official municipal policy, Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)( "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under 1983 for a single decision by its properly constituted legislative body - whether or not that body had taken similar action in the past or intended to do so in the future - because even a single decision by such a body unquestionably constitutes an act of official government policy. See, e. g., Owen v. City of Independence, 445 U.S. 622 (1980) (City Council passed resolution firing plaintiff without a pretermination hearing); Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981) (City Council canceled license permitting concert because of dispute over content of performance). But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. Monell's language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," Monell, supra, at 694, and whose decisions therefore may give rise to municipal liability under 1983").

While defendants claim that other entities act as "policy-makers," for the Village, the SAC alleges the contrary, at least as to the plaintiffs, and the court cannot now adjudicate the case based on defendants' representations.

## CONCLUSION

The SAC sufficiently alleges a plausible violation of both the 14th and 1st Amendments and provides defendants sufficient notice of the claimed unconstitutional conduct. Qualified immunity should be denied at this stage of the proceeding and the Monell claim should be permitted to proceed.

Respectfully submitted,

Michael H. Sussman [3497]

Sussman & Associates
1 Railroad Avenue, Suite 3
PO Box 1005
Goshen, NY 10924
(845)-294-3991

Counsel for plaintiffs

Dated: November 3, 2017