**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TAL PROPERTIES OF POMONA, LLC, and
AVROHOM MANES,

*Plaintiffs*,

-*against*-

VILLAGE OF POMONA, BRETT YAGEL,
MAYOR OF THE VILLAGE OF POMONA,
and DORIS ULMAN,

*Defendants.*

**17-CV-02928 (CS)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR RELIEF FROM ORDER AND JUDGMENT**

**SCHLAM STONE & DOLAN LLP**

Bradley J. Nash
26 Broadway, 19th Floor
New York, NY 10004
Phone: 212-344-5400
Fax: 212-344-7677
E-mail: bnash@schlamstone.com

*Attorneys for Plaintiffs TAL Properties of Pomona, LLC and Avrohom Manes*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................ii-iii

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ...........................................................................................................5

    A.    The Dismissal of Plaintiffs' Complaint ...................................................................5

    B.    Ms. Shea's Whistle-Blowing and the Human Rights Report Reveal Defendants' "Hidden Agenda" Against Orthodox Jewish Residents ....................8

             "US vs. Them" Culture .................................................................................9

             Zoning and Construction Permit Issues ..............................................................10

             Code Enforcement and Selective Ticketing.........................................................11

    C.    Defendants' Failure to Provide Access to Public Records in Response to Mr. Manes' FOIL Requests .........................................................................................13

ARGUMENT ..............................................................................................................................14

I.    THE ORDER AND JUDGMENT SHOULD BE VACATED BASED ON NEWLY-DISCOVERED EVIDENCE ............................................................................................15

    A.    The Legal Standard .................................................................................................15

    B.    The Human Rights Report, and Subsequent Revelations Concerning Defendants' Discriminatory Intent Give Rise to a *Pyke* Claim .............................17

II.    THE ORDER AND JUDGMENT SHOULD BE VACATED BASED ON DEFENDANTS' MISCONDUCT IN FAILING TO PRODUCE PUBLIC RECORDS REGARDING COMPARATORS.................................................................20

CONCLUSION............................................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*American Alliance Ins. Co. v. Eagle Ins. Co.*,
  92 F.3d 57 (2d Cir. 1996) ................................................................................. 14-15

*Catskill Dev., LLC v. Park Place Entm't Corp.*,
  286 F. Supp. 2d 309 (S.D.N.Y. 2003) ................................................................. 21

*Commer v. McEntee*,
  2005 WL 1250214 (S.D.N.Y. May 27, 2005) ...................................................... 16

*Davis v. Muler*,
  713 F.2d 907 (2d Cir. 1983) ............................................................................... 15

*Doe v. Village of Mamaroneck*,
  462 F. Supp. 2d 520 (S.D.N.Y. 2006) ..................................................... 4, 17, 20

*Glover v. City of N.Y.*,
  2018 WL 4906253 (E.D.N.Y. Oct. 9, 2018) ......................................................... 19

*Guan N. v. NYC Dep't of Educ.*,
  2014 WL 1275487 (S.D.N.Y. Mar. 24, 2014) ...................................................... 20

*In re: Stage Presence Incorporated*,
  2016 WL 3582650 (Bankr. S.D.N.Y. June 24, 2016) .......................................... 16

*Kurzweil v. Philip Morris Companies, Inc.*,
  1997 WL 167043 (S.D.N.Y. Apr. 9, 1997) .......................................................... 15

*LeClair v. Saunders*,
  627 F.2d 606 (2d Cir. 1980) ............................................................................... 17

*Louis v. Metropolitan Transit Auth.*,
  145 F. Supp. 3d 215 (E.D.N.Y. 2015) ................................................................. 18

*Matter of Emergency Beacon Corp.*,
  666 F.2d 754 (2d Cir. 1981) ............................................................................... 21

*Nemaizer v. Baker*,
  793 F.2d 58 (2d Cir. 1986) ................................................................................. 14

*Pyke v. Cuomo*,
  258 F.3d 107 (2d Cir. 2001) .......................................................................... 17, 19

*Savino v. Town of Southeast,*
   983 F. Supp. 2d 293 (S.D.N.Y. 2013) ................................................................. 17

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,*
   374 F.3d 158 (2d Cir. 2004) ........................................................................... 21

*United States v. Int'l Bhd. of Teamsters,*
   247 F.3d 370 (2d Cir. 2001) ........................................................................... 15

*Village of Arlington Heights v. Metro Housing Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................................. 18-19

**Statutes**

U.S. Const. amend. XIV § 1 ............................................................................. 17

**Rules**

Fed. R. Civ. P.
   9(b) ............................................................................................... 16
   59(b) ........................................................................................... 14, 16
   60(b)(2) ................................................................................. 1, 14, 15, 16
   60(b)(3) ........................................................................................... 14
   60(b)(6) ........................................................................................... 15
   60(3)(6) ........................................................................................... 20

Plaintiffs TAL Properties of Pomona, LLC ("TAL Properties") and Avrohom Manes ("Mr. Manes") submit this memorandum of law, together with the declarations of Avrohom Manes ("Manes Decl."), Noreen Shea ("Shea Decl."), and Bradley J. Nash ("Nash Decl.") in support of their motion for relief from the order of this Court, dated January 10, 2018, granting Defendants' motion to dismiss the Complaint (the "Order"), and the judgment of dismissal, entered on January 12, 2018 (the "Judgment"), pursuant to Fed. R. Civ. P. 60(b)(2), based on newly-discovered evidence, and 60(b)(3), based on Defendants' failure to provide land and building records regarding comparable properties in response to Plaintiffs' FOIL requests, and for leave to amend the Complaint based on this newly-discovered evidence, and to add additional claims relating to new acts of discrimination against Plaintiffs.

Plaintiffs recognize the extraordinary nature of the requested relief – but this motion is based on an extraordinary set of events.

## PRELIMINARY STATEMENT

In January 2018, this Court dismissed Plaintiffs' equal protection and free exercise claims for failure to allege a plausible claim of religious discrimination by the Village, its Mayor, or the Village attorney. In June, however, the New York State Division of Human Rights issued a shocking investigation report (the "Human Rights Report"), Ex. 1,[1] based on interviews of Village officials and employees, and a review of voluminous internal documents, which provides previously-unavailable evidence that Plaintiffs, and other Orthodox Jewish residents of the Pomona, were, in fact, victims of an intentional campaign of religious discrimination by Defendants and others in the Village government. This evidence supports an equal protection

---

[1] Unless otherwise indicated, references to "Ex. __" refer to the Exhibits to the Manes Decl.

claim based on direct evidence of discrimination – a claim Plaintiffs could not have pled before, but in the interest of justice should be permitted to pursue now.

The Human Rights Report is the result of a whistleblower complaint filed by Noreen Shea, a non-Jewish former deputy clerk in the office of the Village Clerk, who objected to the discriminatory treatment of Orthodox Jewish residents – and was fired for that reason.  Ms. Shea revealed what she described as Defendants' "hidden agenda against [] Jewish residents," stating in stark terms: "***If anyone dares tell me there is no religious discrimination in the Village of Pomona, they have not worked a day in the building department***."  Ex. 3 at 32.

Some of the more troubling examples of discriminatory animus described by Ms. Shea in last month's Human Rights Report (and the testimony of other victims and municipal officials who were prompted to come forward by her whistle-blowing) include the following:

- Mayor Yagel routinely referring to Orthodox Jews in the Village office with open hostility as "***Them***" or "***Those People***."

- Mayor Yagel chastising Ms. Shea for talking with Mr. Manes and complimenting his young daughter, and instructing Ms. Shea that she should have "very little conversation with '***those types***.'"

- Mayor Yagel confronting a long-time village resident who had sold her home, and demanding to know if she had sold the property to one of "***Them.***"

- Mayor Yagel suggesting that Ms. Shea place pork rinds on the public counter of the village clerk's office to deter the growing Orthodox Jewish population seeking access to municipal services.

- The Village building inspector, Louis Zummo, ***admitting*** to the Human Rights Division that he mocked Orthodox Jewish residents, in the course of performing his official duties, through "comical" imitations of their manner of talking, while disparaging them as "carrying on" when they were denied services.

- Building Inspector Zummo advising the village zoning board not to issue a construction permit to Plaintiff Robert Klein to build a basement because it would be "just like them" to then use it as an illegal apartment.

- Building Inspector Zummo refusing to issue a permit requested by an Orthodox Jewish family to accommodate two severely disabled children – and commenting: "maybe he should stop having children".

- Orthodox Jewish residents facing arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to by a non-Jewish village trustee, Ian Banks, who spoke to the Human Rights Division investigators.

- Village Attorney Doris Ulman admitting to Mr. Manes and his attorney in another action, on or about July 19, 2018, that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village," and attempting to justify her involvement with the excuse that, "it's my job to represent Mayor Yagel," when in fact she represents the Village, including its Jewish residents.

- The Village government "target[ing] the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings (which Mayor Yagel called "shul patrols").

Ms. Shea alleges that her refusal to participate in the discriminatory treatment of Orthodox Jewish residents, including Mr. Manes, led Defendant Yagel to retaliate against her. In a shocking example, Ms. Shea alleges that Mayor Yagel referred to her as a "***Jew Lover***" – an accusation that was reported to Trustee Banks at the time (Mr. Banks confirmed that he was aware of it prior to Ms. Shea's termination). Ms. Shea was ultimately terminated when she refused to heed Yagel's instructions to "stop being too cooperative with Jewish residents."

The Human Rights Division found "probable cause to support" Ms. Shea's allegations and took the unusual step of ordering the matter to proceed to a public hearing before an administrative law judge. Of course, because Plaintiffs' Complaint was dismissed on a pleading motion, the truth of Ms. Shea's allegations, and the other evidence contained in the Human Rights Report, would have been presumed. As such, the relevant consideration in this motion is whether this newly-discovered evidence supports a plausible claim for relief that would survive a motion to dismiss. As shown below, it easily does.

3

In the Order, this Court acknowledged that Plaintiffs had "done a fine job of showing that defendants . . . treated them unfairly," Nash Decl., Ex. 2 at 17:11–13, but the Court noted that Plaintiffs had failed to allege a plausible basis to infer that this mistreatment was "motivated by intent to discriminate on the basis of religion." *Id.* at 14:18–19.

The fact-gathering and admissions in the recently-issued Human Rights Report fill the gaps this Court identified in Plaintiffs' Complaint with previously-unavailable evidence that the very officials who treated Plaintiff "unfairly" were, at the same time, expressing discriminatory animus against Orthodox Jewish residents of Pomona in general – and Mr. Manes in particular. Plaintiffs should therefore be granted relief from the Order and Judgment, and should be permitted to plead a new equal protection claim based on newly-discovered direct evidence of discriminatory intent.

The Second Circuit recognizes several methods of pleading a violation of the Equal Protection Clause. Based on the then-available evidence, Plaintiffs originally relied solely on a so-called "selective enforcement" theory, which requires a showing of similarly-situated persons (or "comparators") who received more favorable treatment. The Court held in the Order that the Complaint did not plead sufficient detail regarding such comparators to state a selective enforcement claim. However, when a plaintiff alleges *direct* evidence of illicit discrimination – as the record now permits given the Human Rights Report – comparators are no longer required. An equal protection violation rooted in direct evidence of discrimination (known as a "*Pyke* claim") "dispenses with the need to plead that a similarly situated group was treated differently"; instead, where government officials set out to discriminate against members of a protected class (such as a religious minority) "discriminatory effects can be presumed." *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520 (S.D.N.Y. 2006) (McMahon, J.).

In any case, the newly-discovered evidence also shows that Defendants were responsible for Plaintiffs' inability to develop sufficient evidence of comparators to plead a selective-enforcement claim. The Human Rights Report, and Ms. Shea's subsequent revelations, show that the Village failed to produce public land records in response to Mr. Manes' FOIL requests, making it impossible for him to identify specific comparators to support a selective enforcement theory. This misconduct relating to Village records is an additional and independent basis to vacate the judgment.

In sum, the unusual and disturbing nature of the newly-available evidence of Defendants' intentional discrimination and other misconduct justifies vacating the Judgment and allowing Plaintiffs to have their day in court.

## STATEMENT OF FACTS

### A.     The Dismissal of Plaintiffs' Complaint

Plaintiff Avrohom Manes is an Orthodox Jewish resident of the Village and an investor in real estate. Nash Decl., Ex. 1 ("Compl.") ¶ 2. Tal Properties of Pomona, LLC is wholly-owned by Mr. Manes. *Id.* ¶ 1.

In late 2015, Mr. Manes purchased a residential home at 22 High Mountain Road in Pomona (the "Property"), as well as other subdivided but undeveloped properties.[2] *Id.* ¶ 8. Over the next year, Defendants engaged in a concerted effort to harass Mr. Manes, through selective application (and misapplication) of local zoning and construction laws, with the goal of preventing him from maximizing the value of the Property and selling it.

The Complaint identifies three separate categories of selective mistreatment.

---

[2]     It is important to note that the properties Mr. Manes purchased were subdivided and approved by the Village for residential use years ago – prior to the influx of Orthodox Jewish residents. But the village has now changed course and is impeding the building of residences and refusing/delaying providing certificates of occupancy. Manes Decl. ¶ 2.

*First*, at the direction of Defendants Yagel and Ulman, the Building Inspector delayed for months in issuing a certificate of occupancy for the Property – even though he had confirmed in December 2015 that Plaintiffs had completed all necessary repairs and was in compliance with applicable building codes and promised at that time that a certificate of occupancy would be issued promptly. *Id.* ¶¶ 10–14. To justify their actions, Defendants Yagel and Ulman claimed falsely that Plaintiffs were responsible for a $6,000 debt that was supposedly owed to the Village by a prior owner of the Property. Defendants had no right to do this, since among other things they never recorded this supposed debt as a lien against the Property prior to Plaintiffs' purchase. Tellingly, Defendants never made any effort to collect the debt from the prior (non-Jewish) owner, even permitting a bond he had posted to lapse without collection, though he had failed to complete a roadwork project secured by the bond. Defendants were looking for any excuse to deny a certificate of occupancy to Plaintiffs. *Id.* ¶¶ 16–21.

*Second*, Defendants withheld a grading permit from Plaintiffs that would have permitted them to create useable backyard space out of steep slopes on the property, thus enhancing its value. Plaintiffs spent time and money developing a grading plan in conjunction with the Village engineer, but Defendants Yagel and Ulman pressured the engineer to retract his approval of the plan, and to insist that Plaintiffs comply with costly prerequisites that were never imposed on other similarly-situated owners – namely, that Plaintiffs post a bond for possible damage to neighboring property and test the compressed fill they used for grading. And even after Plaintiffs agreed to these conditions, Defendants still denied them the grading permit. *Id.* ¶¶ 23–33.

Ultimately, Plaintiffs signed a contract of sale for the Property in the fall of 2016 – though at a greatly reduced price because of the inability to complete the grading work in the

backyard. *Id.* ¶¶ 34–37. But even then, Defendants' harassment did not end. Although Defendants dropped their claim for the supposed $6,000 debt, and issued a certificate of occupancy for the Property, they threatened to revoke it unless Plaintiffs would sign a document acknowledging that the road accessing the property was not a Village road, and that its maintenance was the sole responsibility of the Property's owner. This demand was contrary to Village practice, and not authorized by law, and represented another attempt by Defendants to complicate and impede Plaintiffs' sale of the Property to a Jewish family. Although the sale ultimately closed, the extensive and unjustified delays in issuing the certificate of occupancy and the discriminatory imposition of grading conditions caused Plaintiffs to suffer a substantial decline in the sale price of the Property, as a result of which they lost out on other profitable business opportunities. *Id.* ¶¶ 39–42.

On March 16, 2017, Plaintiffs filed this action in state court, and it was removed to this Court on April 21, 2017. Plaintiffs' Second Amended Complaint asserted two claims – for violations of the Equal Protection and Free Exercise Clauses of the United States Constitution – against the Village, Mayor Yagel and Village Attorney Ulman. *Id.* ¶¶ 48–49. Defendants filed a motion to dismiss, which was granted on the record on January 10, 2018. Nash Decl., Ex. 2 (the "Order"). Judge Seibel held that Plaintiffs' equal protection claim – asserted under a "selective enforcement" theory – failed to allege sufficient detail regarding "comparators" (i.e., similarly-situated individuals who received more favorable treatment), and failed to make non-conclusory allegations that Defendants were motivated by religious animus. As for the comparators, the Court held that the Complaint needed to, but did not, "provide specific examples of similarly situated persons applying for a CO or a grading permit, much less examples of similarly situated

persons receiving preferential treatment." Order at 10:21–24.[3]  On the issue of religious-based animus, the Court held that Plaintiffs' allegations were conclusory, noting that "Plaintiffs must do more than allege that defendants knew Manes was Jewish and that something bad happened to plaintiffs."  Order at 14:22–23.

The Court concluded that "plaintiffs have done a fine job of showing that the defendants indeed gave plaintiffs a hard time . . . and treated them unfairly . . . but they have not alleged facts suggesting that they were treated unfairly because Manes was Jewish."  Order at 17:11–17. Accordingly, they failed to state any federal cause of action.

The Court entered a judgment of dismissal on January 12, 2018.  Nash Decl., Ex. 3.

**B.**     **Ms. Shea's Whistle-Blowing and the Human Rights Report Reveal Defendants' "Hidden Agenda" Against Orthodox Jewish Residents**

Five months after entry of the Order and Judgment, the New York State Division of Human Rights issued a report, following an extensive investigation of alleged discrimination against Orthodox Jewish residents by the Village government.  Ex. 1.  The non-public investigation was sparked by a whistleblower complaint, Ex. 2, filed by Noreen Shea, a former non-Jewish employee in the Village Clerk's office, who alleges that she was terminated because she was unwilling to be complicit in "an ongoing hidden agenda against [] Jewish residents" of Pomona.  Ex. 1 at 2.  Ms. Shea's allegations – and other evidence uncovered by the Human Rights investigator – is disturbing to say the least.  The evidence of intentional religiously-motivated discrimination that the Court previously found lacking is now overwhelming and is summarized below.

---

[3]     As discussed below, Defendants failed to produce in response to FOIL requests the property records that would have enabled Plaintiffs to make sufficient allegations of similarly-situated comparators who received preferential treatment.

**"Us vs. Them" Culture**.  Ms. Shea described an "Us vs. Them" culture cultivated by Mayor Yagel in the Village offices with respect to Orthodox Jewish residents.  According to Ms. Shea, Mayor Yagel routinely refers to Orthodox Jews, including Mr. Manes, with contempt as "***Them***" or "***Those People***".  *See, e.g.*, Ex. 1 at 5; Ex. 3 at 13, 34.  In one instance, Mayor Yagel chastised Ms. Shea for having a "nice, friendly conversation" with Mr. Manes, who had come to the Village office "seeking information about one of his properties."  Ex. 2 ¶¶ 5–6.  He instructed Ms. Shea that she was to have "very little conversation with '***those types***.'"  *Id.*  Similarly, Mayor Yagel berated a long-standing resident who had sold her home through a broker known for working with Orthodox Jews, demanding to know whether she had sold the property to "***Them***."  Ex. 3 at 34.  In another troubling incident, Mayor Yagel told Ms. Shea that pork rinds be placed on the public counter of the Clerk's office to deter Orthodox Jews who come in the office seeking municipal services.[4]  Ex. 1 at 1.

Mayor Yagel criticized Ms. Shea for responding too quickly to requests from Orthodox Jewish residents, instructing her that they should be made to wait.  *Id.* at 1, 5; Ex. 3 at 13, 22.

The open hostility to Orthodox Jews was not limited to Mayor Yagel.  Building Inspector Zummo admitted to the Human Rights Division that he openly mocked Orthodox Jews through impersonations that mimicked their distinctive manner of speaking, which he called "carrying on."  Ex. 1 at 4.

Because Ms. Shea did not want to participate in the unequal treatment of the Village's Orthodox Jewish residents, the Mayor and Building Inspector Zummo referred to her as a "Jew Lover."  *Id.* at 1.  A non-Jewish Village Trustee, Ian Banks confirmed to the Human Rights

---

[4]     When confronted with this allegation by the Human Rights investigator, Mayor Yagel offered a notably weak denial stating only, "I do not recall stating that to her."  Ex. 4  (Interview of Brett Yagel) at 8.

Division investigator that, prior to her termination, Ms. Shea had reported the use of the terms "Jew Lover" (to refer to her) and "Those People" (to refer to Orthodox Jews). *Id.* at 5.

**<u>Zoning and Construction Permit Issues</u>**.  The Human Rights Report reveals that the Village abused its authority by withholding certificates of occupancy and construction permits as part of a broader effort to discriminate against Orthodox Jewish residents.

The Human Rights Division investigator reports testimony that other Orthodox Jewish residents, in addition to Mr. Manes, faced arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to not only by Ms. Shea but also by a non-Jewish village trustee, Ian Banks.  *Id.* at 4–5; Ex. 3 at 8, 30.

Ms. Shea described that Building Inspector Zummo refused to issue a permit requested by an Orthodox Jewish family with two severely disabled children.  Ms. Shea overheard Zummo comment, in connection with the decision to deny the permit, that "maybe he should stop having children".  Ex. 3 at 17.  And in another incident reported by a Jewish Village Trustee, Robert Klein, Zummo advised the Village zoning board not to issue a permit to Mr. Klein for work on his basement because it would be "just like them" to then use it as an illegal apartment.  Ex. 4 (Interview of Robert Klein Interview) at 33.

In a meeting in July 2018, Defendant Ulman admitted to Manes that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village." Manes Decl. ¶ 19.  Ulman also admitted that the Village board of trustees improperly targeted Mr. Manes by pursuing a claim that he is responsible for maintaining the roads accessing his properties, when they did not make such claims against other similarly-situated property owners. *Id.* ¶ 20.

Ulman attempted to absolve herself of responsibility by stating that "it's my job to represent Mayor Yagel" – when, in fact, she represents the Village – and by claiming that she eventually resigned from representing the Village zoning board because of its discriminatory treatment of Robert Klein and other Orthodox Jewish residents. *Id.* Ulman made these self-serving statements after learning that Plaintiffs' counsel was conducting an investigation of discrimination against Orthodox Jews in the Village, and that residents of the Village had obtained the files of the New York Division of Human Rights report.

Further, in a conversation with Mr. Manes following the issuance of the Human Rights Report, Zummo admitted that Yagel and Ulman intentionally caused delays in the issuance of a certificate of occupancy for his property at 22 High Mountain Road by imposing requirements that were not applied to other non-Jewish property owners. *Id.* ¶ 9. Zummo further stated that reason for the disparate treatment of Mr. Manes was that Mayor Yagel does not "tolerate change" and "feels threatened" by the Orthodox Jewish

community moving into the Village. *Id.* ¶ 10. Zummo said that Yagel would make comments such as "We don't want this element" or "we don't want them" in reference to Orthodox Jews. *Id.*

**Code Enforcement and Selective Ticketing**. The Human Rights Report also reflects evidence that Defendants improperly "targeted the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and synagogues for garbage violations (in one instance at 4:25 am on the Sabbath). Ex. 1 at 2. Mayor Yagel ordered the early morning ticket blitzes, which he referred to as "shul patrols."

The investigator notes that he reviewed emails from Defendant Yagel to Building Inspector Zummo ordering him to issue violations. *E.g.*, *id.* at 4 ("Please ensure that this is

notice for violation and removed asap"; "MS4 violation!!!! Violate!"). In addition, when interviewed by the Human Rights Investigator, Building Inspector Zummo admitted that Defendant Yagel directed him to perform garbage inspections "on the weekend." *Id.* at 4.

A new lawsuit filed by Robert Klein and two other residents of Pomona (Samuel Indig and Meir Kahana) alleges other instances of Defendants targeting Orthodox Jewish residents for discriminatory treatment, including:

- Mr. Indig being improperly denied permission to complete grading work on his backyard that the building inspector initially approved, leaving him with an unsafe slope that makes his yard unusable by his family;

- Mr. Klein being denied construction permits and subjected to serial stop work orders that have prevented him for years from completing renovations to his house, and also facing discriminatory ticketing for supposed leaf disposal violations, when non-Jewish neighbors were not similarly ticketed; and

- Mr. Kahana being targeted by Defendants for discriminatory code enforcement, including a ticket he received for a Toys 'R' Us pool he temporarily placed in his yard and a warning notice for dog waste, though he has no dog.

*See* Ex. 5.

Mr. Manes has also faced additional acts of discrimination over the past year, including:

- Defendant Zummo issuing a bogus stop work order for a project at Mr. Manes' home – on instructions from Defendant Yagel – while at the same time declining to intervene when a non-Jewish neighbor performed a project that Zummo admitted was not code compliant and for which no permit was issued;

- The Village refusing to issue a property tax refund to Mr. Manes, despite two Court orders reducing his assessment;

- The Village making a frivolous claim that Mr. Manes is responsible for an alleged snow removal bill; and

- Defendant Ulman admitting that she urged a property owner not to sell his parcels to Mr. Manes and instead to sell the property to a buyer who was not an Orthodox Jew.

Manes Decl. ¶¶ 9–14.  Should the Court grant the motion for relief from the Order and

Judgment, Plaintiffs will add claims for Defendants' additional acts of illicit discrimination.

C.  **Defendants' Failure to Provide Access to Public Records in Response to Mr. Manes'**
    **FOIL Requests**

The Human Rights Report also exposes Defendants' misconduct in failing to provide

documents in response to Mr. Manes' requests for access to public land and building records

under New York's FOIL statute.  Prior to this Court's entry of the Order dismissing his

Complaint for failure to state a claim, Mr. Manes made numerous attempts to obtain records

from the Village regarding similarly-sloped properties that would serve as comparators in

support of his selective enforcement claim.  Manes Decl. ¶¶ 21–25.  However, he was either told

there was "no file", or the relevant documentation was missing from the file.  *Id*.

The Human Rights Report shows that Plaintiffs' inability to obtain evidence of

comparators was not a coincidence but the result of Defendants' deliberate misconduct.  The

Human Rights Division investigator heard testimony from Ms. Shea and Village Trustee Ian

Banks that the "building files were in disarray"; that Ms. Shea complained of an inability to

access records and a lack of training in how to do so; and that two memorandums Ms. Shea sent

to the Trustees reporting on these issues went unheeded.  Ex. 1 at 5.  Even worse, Ms. Shea

reported that she was chastised for being "too cooperative" with Orthodox Jewish residents in

responding to their record requests, and that she was instructed to "make them wait" for a

response even if it could be provided expeditiously.  Ex. 3 at 22.  Further, Ms. Shea describes

"an overall attitude in the Village of Government to be unresponsive to requests from Orthodox

Jewish residents for access to property records" – although, when a non-Jewish person came to

the Village office to make a FOIL request, Mayor Yagel instructed her to provide the records

immediately.  Shea Decl. ¶ 4.

Moreover, Ms. Shea explains that only files located on the ground floor of the Village office were served in response to FOIL requests – other records stored in the basement were not searched. *Id.* ¶ 5.

Zummo has likewise admitted to Mr. Manes that the Village files were in disarray and that files stored in the basement of the Village Office were not searched in response to FOIL requests. Manes Decl. ¶ 29. In particular, he admitted that relevant documents on 22 High Mountain (i.e., the documents relating to the slope) were missing. *Id.* And he acknowledged that the files necessary to show comparators elsewhere on the street or nearby streets were either missing entirely, or the relevant portion was missing. *Id.*

Zummo admitted to Mr. Manes that Defendants improperly altered Village records. Specifically, Defendant Ulman caused the file for 22 High Mountain to be altered in an effort to substantiate the claim that there was a $6,000 bill for work associated with the property. *Id.* ¶ 30. He reviewed the file and found no evidence of such a bill. However, at the direction of Ulman, Village staff added "notes" to the file reflecting the supposed bill. *Id.*

Thus, it is Defendants who were responsible for the lack of evidence of comparators.

## ARGUMENT

Rule 60(b) provides that "the court may relieve a party . . . from a final judgment, order, or proceeding" based on, *inter alia*, (1) "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"; or (2) "misconduct by an opposing party." Fed. R. Civ. P. 60(b)(2), (3). "Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). Because "[s]trong public policy favors resolving disputes on the merits," *American Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir.

1996), "all doubts should be resolved in favor of those seeking relief under . . . [Rule] 60(b)."

*Davis v. Muler*, 713 F.2d 907, 915 (2d Cir. 1983).

As demonstrated below, the evidence in the Human Rights Report, and other revelations of deliberate discrimination in Pomona, justify vacating the Order and Judgment based on both "newly-discovery evidence," and the Defendants' "misconduct."

## I. THE ORDER AND JUDGMENT SHOULD BE VACATED BASED ON NEWLY-DISCOVERED EVIDENCE

### A. The Legal Standard

To prevail on a motion under Rule 60(b)(2), Plaintiffs must demonstrate that: (1) "the newly discovered evidence was of facts that existed at the time" of the Order and Judgment; (2) Plaintiffs were "justifiably ignorant of them despite due diligence"; (3) the evidence is "of such importance that it probably would have changed the outcome"[5]; and (4) the evidence is "not merely cumulative or impeaching." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001).

Courts in this district have granted Rule 60(b)(2) motions based on newly-available evidence that would have changed the outcome of a dispositive motion. *See, e.g.*, *Kurzweil v. Philip Morris Companies, Inc.*, 1997 WL 167043, at *4–9 (S.D.N.Y. Apr. 9, 1997) (Mukasey, J.) (granting Rule 60(b)(2) motion because "internal and industry documents" that became available after court dismissed the complaint "is of enough potential importance" that the court "probably

---

[5]     Much of the case law regarding Rule 60(b) arises in the context of a judgment entered following a trial or other factual determination.  For that reason, some cases speak of a requirement that the newly-discovered evidence also be shown to be "admissible."  Because this case never got past the motion to dismiss stage, "admissibility" is not at issue.  The only question is whether the newly-discovered evidence would, if pled in an amended complaint, change the outcome of Defendants' Rule 12(b)(6) motion.  *See Kurzweil v. Philip Morris Companies, Inc.*, 1997 WL 167043, at *5 (S.D.N.Y. Apr. 9, 1997) (Mukasey, J.) (applying motion to dismiss standard to "plaintiffs' newly discovered evidence on a Rule 60(b)(2) motion").  Indeed, in many ways, this motion is similar to a request to re-plead.

would not have granted defendants' motion to dismiss had it been described in the initial complaint"); *Commer v. McEntee*, 2005 WL 1250214, at *2–3 (S.D.N.Y. May 27, 2005) (Sweet, J.) (granting motion based on affirmation signed after order of dismissal that created a "factual issue," thus "requir[ing] that the summary judgment be vacated"); *In re: Stage Presence Incorporated*, 2016 WL 3582650, at *5–6 (Bankr. S.D.N.Y. June 24, 2016) (granting motion where "new evidence supports the pleading of a fraud claim in compliance with Rule 9(b), and plainly would have led to a different result if the information had been known at the time of the prior judgment").

Here, the evidence newly-revealed in the Human Rights Report – and by additional witnesses who came forward in its wake – meets each of the prerequisites for a Rule 60(b)(2) motion. Ms. Shea's testimony and other evidence in the Human Rights Report have revealed a "hidden agenda against Jewish residents" in Pomona that was ongoing during the relevant period (and before entry of the Order and Judgment). And because the Human Rights Report was not issued until June 4, 2018, Plaintiffs were necessarily "justifiably ignorant" of these facts before the Order and Judgment were entered on January 10 and 12, 2018 – and during the 28-day period for filing a Rule 59(b) motion.

Finally, as shown below, the newly-available evidence of discriminatory animus against Orthodox Jews by Mayor Yagel and other Village officials now gives rise to a new type of equal protection claim for discriminatory application of facially neutral laws. Plaintiffs were unable to plead this claim prior to the dismissal of their Complaint. In the interest of justice, they should be allowed to do so now.

**B.** **The Human Rights Report, and Subsequent Revelations Concerning Defendants' Discriminatory Intent Give Rise to a *Pyke* Claim**

The Fourteenth Amendment states in pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. As the Second Circuit explained in the seminal case *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001), "there are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." *Id.* at 109. Based on the then-available evidence, Plaintiffs originally pursued their equal protection claim on a "selective enforcement" theory, which requires a showing that the plaintiff was selectively mistreated in comparison to other similarly-situated individuals. *See LeClair v. Saunders*, 627 F.2d 606, 609–610 (2d Cir. 1980). *Pyke* recognized another type of equal protection claim for "discriminatory application of facially neutral laws based on direct evidence" of discriminatory intent. *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 299–300 (S.D.N.Y. 2013) (Román, J.), *aff'd*, 572 F. App'x 15 (2d Cir. 2014). Such a claim does not depend on comparators, but rather requires a showing that the defendants were "motivated at least in part by a . . . discriminatory purpose." *Village of Mamaroneck*, 462 F. Supp. 2d at 546.

In the Order, the Court dismissed Plaintiff's selective enforcement claim for failure to plausibly allege (1) "comparators that are similarly situated [to Plaintiffs] in all material respects," Order at 9:5–6; and (2) "that the defendants' actions were motivated by religious-based animus." *Id.* at 14:11–12. The newly-discovered evidence in the Human Rights Report gives rise to a *Pyke* claim for intentional discrimination, thus resolving both deficiencies.

***First***, following the release of the Human Rights Report, the record is now replete with direct, non-conclusory evidence of Village officials' discriminatory animus against Orthodox Jewish residents, including Mr. Manus. Indeed, Ms. Shea testified based on first-hand

experience to an "ongoing hidden agenda against [] Jewish residents" of Pomona, and Defendant Ulman, and Building Inspector Zummo subsequently admitted to Mr. Manes that the Defendants intentionally discriminated against Orthodox Jews generally, and Mr. Manes in particular, in zoning and code enforcement matters.

The contemporaneous statements of Village officers, reflected in the Human Rights Report and provided by witness who came forward after its issuance, further expose Defendants' discriminatory motives. To select just a few examples, Ms. Shea reports that, at the same time Defendants were subjecting Plaintiff to "unfair" treatment, Mayor Yagel routinely disparaged Orthodox Jews as "Them" and "Those People"; chastised Ms. Shea for having a "nice, friendly conversation" with Mr. Manes and instructed her to "have very little conversation with 'those types'"; berated a Village resident for selling her home to one of "Them"; and even more shockingly, branded Ms. Shea a "Jew Lover," and terminated her employment for refusing to be complicit in a "hidden agenda" against Orthodox Jewish residents. Similarly, and equally offensively, Building Inspector Zummo – who carried out Mayor Yagel's orders to harass Mr. Manes by improperly denying him a certificate of occupancy and construction permits for his property – admitted to mocking Jewish residents by performing "impersonations" of their "carrying on"; reportedly told the Village zoning board that it was "just like them" (i.e., Orthodox Jews) to build illegal basement apartments; and disparaged another such resident who required a permit to accommodate two severely disabled children, saying that he should "stop having children."

It is well-established that "contemporaneous statements by decision-makers" are probative of a discriminatory motive. *Louis v. Metropolitan Transit Auth.*, 145 F. Supp. 3d 215, 226 (E.D.N.Y. 2015) (Glasser, J.) (citing *Village of Arlington Heights v. Metro Housing Dev.*

*Corp.*, 429 U.S. 252, 266–68 (1977)). In particular, the use of "epithets" – such as "**Jew Lover**", "**Them**", "**Those People**", and "**Those Types**" – "may be regarded as direct evidence of . . . animus." *Id.* Thus, whereas the Court found that the Complaint failed to alleged facts to support an inference of religious-based discrimination, the newly-discovered evidence now in the record easily supports the allegation that Defendants' unfair treatment of Mr. Manes was motivated by anti-Jewish animus.

*Second*, the new evidence of intentional religious animus in the Human Rights Report, and the statement of other witnesses, supports a claim for discriminatory application of facially neutral laws under *Pyke v. Cuomo*. In *Savino*, 983 F. Supp. 2d at 303–305, the Court held that a plaintiff could establish a discriminatory motive for a Zoning Enforcement Officer's issuance of a cease and desist order based on a single "derogatory comment" the Officer made about Italians. This coupled with evidence that the plaintiff sustained an economic loss resulting from the Officer's conduct was sufficient for the plaintiff's *Pyke* claim to survive summary judgment. Here, the extensive allegations of anti-Jewish animus noted above – which far surpass a single derogatory comment – together with the evidence of Defendants' unfair treatment of Plaintiffs is more than sufficient to establish a *Pyke* claim at the pleading stage.

Plaintiffs' new *Pyke* claim dispenses with the need for "comparators." As the Second Circuit held in *Pyke*, "a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory . . . manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different [group] in order to establish a claim of denial of equal protection." *Pyke*, 258 F.3d at 110; *see also Glover v. City of N.Y.*, 2018 WL 4906253, at *16 (E.D.N.Y. Oct. 9, 2018) (Brodie, J.) ("a plaintiff proceeding under the theory that a facially neutral law has been applied in a discriminatory manner need not present

comparator evidence"); *Guan N. v. NYC Dep't of Educ.*, 2014 WL 1275487, at *16 n.7

(S.D.N.Y. Mar. 24, 2014) (Nathan, J.) ("Outside the specific context of selective prosecution

claims, a plaintiff need not point to differential treatment of similarly situated individuals outside

her protected group.").  As Judge McMahon has explained:

> Once [] discriminatory intent infects the application of a neutral law or
> policy, the group that is singled out for discriminatory treatment is no
> longer similarly situated to any other in the eyes of the law, so adverse
> effects can be presumed.  In effect, the law recognizes that a government
> that sets out to discriminate intentionally in its enforcement of some
> neutral law or policy will rarely if ever fail to achieve its purpose.

*Village of Mamaroneck*, 462 F. Supp. 2d at 543.  Therefore, because Plaintiffs can now state a

*Pyke* claim, the issue of comparators is irrelevant.

In sum, in light of the extraordinary whistle-blower evidence in the Human Rights Report

– which Plaintiffs could not have had access to before entry of the Order and Judgment –

Plaintiff can now plead an equal protection claim that would easily survive a motion to dismiss.

For this reason, the Order and Judgment should be vacated and Plaintiffs should be afforded their

day in court.

## II.    THE ORDER AND JUDGMENT SHOULD BE VACATED BASED ON DEFENDANTS' MISCONDUCT IN  FAILING TO PRODUCE PUBLIC RECORDS REGARDING COMPARATORS

Finally, although the newly-discovered evidence discussed above, on its own, justifies

reinstating Plaintiffs' Complaint, the Court should also grant relief from the judgment under Fed.

R. Civ. P. 60(3)(6) based on Defendants' misconduct in failing to provide public land and

building records in response to Mr. Manes' FOIL requests to support his selective enforcement

claim.  This failure to provide meaningful access to records prevented Mr. Manes from providing

evidence of "comparators" – *i.e.*, similarly-situated properties owned by non-Jews as to which

the Defendants did not impose the same onerous conditions, as required to establish an Equal Protection Clause violation on a "selective enforcement" theory.

Rule 60(b)(3) applies "where material information has been withheld or incorrect or perjured evidence has been intentionally supplied." *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981). A movant "must show that the conduct complained of prevented the moving party from fully and fairly presenting his case." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004) (quotation marks and citations omitted). However, no showing of fraud or bad faith is required, and "even an accidental failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of Rule 60(b)(3)." *Catskill Dev., LLC v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309, 314–15 (S.D.N.Y. 2003) (McMahon, J.).

Here, Defendants frustrated Mr. Manes' attempts to obtain evidence of comparators. Mr. Manes submitted FOIL requests for these records, but after multiple delays was either told that no file existed, or in other instances the relevant records were missing from the file. The Human Rights Report shows that this was no coincidence, but was the result of Defendants' misconduct. Ms. Shea and Trustee Banks told the Human Rights investigator that the building department records were "in disarray"; Ms. Shea was not given adequate training in how to access the files; and two memos she sent to the Board of Trustees on this important issue were ignored. Moreover, the Village did not search records stored in the basement of the Village office in response to FOIL requests.

When Ms. Shea nevertheless tried to be responsive to record requests from Mr. Manes and other Orthodox Jewish residents, she was chastised by Defendants for being "too cooperative" and was admonished to make them wait. Ms. Shea describes "an overall attitude in

the Village of Government to be unresponsive to requests from Orthodox Jewish residents for access to property records" – although Mayor Yagel instructed her to provide records to a non-Jewish resident immediately. And Zummo admitted to Mr. Manes that Defendants tampered with the file for his property at 22 High Mountain Road in order to create a "record" of an alleged bill for work associated with his properties.

In sum, although Mr. Manes need not establish deliberate fraud or bad faith to obtain relief under Rule 60(b)(3), the newly-uncovered evidence shows that Defendants' misconduct in responding to FOIL requests for property records prevented Mr. Manes from "fully and fairly presenting his case" prior to the entry of the Order.

For this reason, as well, Mr. Manes should be granted relief from the Order and Judgment.

## <u>CONCLUSION</u>

For the reasons explained above, Plaintiffs' motion for relief from the Order and Judgment should be granted.


Dated: New York, New York
      November 2, 2018

Respectfully submitted,

**SCHLAM STONE & DOLAN LLP**

By: _____/s/_____
    Bradley J. Nash
    26 Broadway, 19th Floor
    New York, NY 10004
    Phone: 212-344-5400
    Fax: 212-344-7677
    E-mail: bnash@schlamstone.com

*Attorneys for Plaintiffs TAL Properties of Pomona, LLC and Avrohom Mane*
