Exhibit 4

 LawManager

NYS DHR
EVENT HISTORY WITH COMMENTS

Name: Noreen Shea v Village of Pomona (1)

| Complaint ID | Complaint Code | Date Filed | Investigating Officer | HRS |
|---|---|---|---|---|
| 10190879 | 17-E-C-E | 11/3/2017 | White Plains | Daniel Jean-Gilles |

By: rcaquias

1

**Events (32)**

| | |
|---|---|
| MOU Agency | |
| Complaint Filed | |
| Subtype | |
| Date | Fri 11/3/2017 |
| Status | Completed |
| Date Completed | 11/9/2017 |
| Comments | |

| | |
|---|---|
| Regional | |
| Serve Complaint on Respondent | |
| Subtype | |
| Date | Fri 11/3/2017 |
| Status | Completed |
| Date Completed | 11/9/2017 |
| Comments | |

| | |
|---|---|
| EEOC Contracts | |
| Review Intake (ECU) | |
| Subtype | |
| Date | Fri 11/3/2017 |
| Status | Completed |
| Date Completed | 11/9/2017 |
| Comments | |

| | |
|---|---|
| Regional | |
| Response Due Date | |
| Subtype | |
| Date | Fri 11/24/2017 |
| Status | Completed |
| Date Completed | 11/27/2017 |
| Comments | |

| | |
|---|---|
| MOU Agency | |
| Response Received from Respondent | |
| Subtype | |
| Date | Mon 11/27/2017 |
| Status | Completed |
| Date Completed | 11/27/2017 |
| Comments | |

| | |
|---|---|
| MOU Agency | |
| Correspondence Sent | |
| Subtype | E-mail and mail |
| Date | Thu 11/30/2017 |
| Status | Completed |
| Date Completed | 11/30/2017 |
| Comments | Second request letter for a narrative response sent to Respondent. |


Name: Noreen Shea v Village of Pomona (1)

Events (32)

| | |
|---|---|
| MOU Agency | Response Received from Respondent |
| Date | Mon 12/11/2017 |
| Status | Completed |
| Date Completed | 1/9/2018 |
| Comments | Respondent's attorney submits a verified supplemental answer to the complaint. |

| | |
|---|---|
| MOU Agency | Rebuttal Requested |
| Date | Tue 12/12/2017 |
| Status | Completed |
| Date Completed | 1/9/2018 |
| Comments | |

| | |
|---|---|
| Regional | Rebuttal Due Date |
| Date | Wed 12/27/2017 |
| Status | Completed |
| Date Completed | 1/9/2018 |
| Comments | |

| | |
|---|---|
| MOU Agency | Rebuttal Received |
| Date | Wed 12/27/2017 |
| Status | Completed |
| Date Completed | 1/9/2018 |
| Comments | |

| | |
|---|---|
| Regional | Rebuttal Received |
| Date | Wed 12/27/2017 |
| Status | Completed |
| Date Completed | 1/9/2018 |
| Comments | |

| | |
|---|---|
| MOU Agency | Additional Information Requested |
| Subtype | Respondent |
| Date | Tue 1/30/2018 |
| Status | Completed |
| Date Completed | 5/11/2018 |
| Comments | Additional documents and information requested from Respondent (D&I). |
| | Witness interview request/notice was also included in this request. |


Name: Noreen Shea v Village of Pomona (1)

Events (32)

MOU Agency
Response Received from Respondent

Tue 2/13/2018
Completed
Date Completed 5/11/2018
Respondent submits partial response to the D&I request.

MOU Agency
Response Received from Respondent

Wed 2/14/2018
Completed
Date Completed 5/14/2018
Respondent submits 2nd partial response to the D&I request, with exhibits.

Regional
Additional Information Due Date

Wed 2/14/2018
Completed
Date Completed 5/14/2018

Name: Noreen Shea v Village of Pomona (1)

Events (32)

MOU Agency

Witness Interview

In Person

Fri 2/23/2018

Completed

5/14/2018

Case Number : 10190879
HUD Number : 16GB800346

Case Name : Noreen Shea v.
Village of Pomona

Witness Name : Brett L. Yagel

Witness Address : Pomona
Village Hall
Witness Telephone :

Date of Birth (If age is alleged) :

Date of Interview : 2/23/18
Method of Interview : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary :

Mr. Yagel was interviewed. He was accompanied
by Doris F. Ulman, Attorney for the Village of
Pomona.

Mr. Yagel stated that he was elected Mayor for
Pomona in March 2011 and his only other elected
position was that of Trustee for Pomona in 2007.

Mr. Yagel said, "Yes" when asked if he had any
knowledge of the complaint that the Complainant
filed against him. The Investigator informed the
Mr. Yagel that the Complainant filed a
discriminatory claim.

Mr. Yagel reported that he appointed the
Complainant in February 2016 without the
approval of the Board because of the vacancy that
had become available after the retirement of the
prior Deputy Clerk. He said that the Mr. Yagel
was reappointed in April 2016, with the Board's
approval, for the position.

Mr. Yagel stated that "From the get go" there
were concerns about the Mr. Yagel's demeanor
with the public, her inappropriate remarks, and
she has "no filters." He said that he attempted to
correct her behavior. However, after an incident
in March 2017, he realized it would not work. He
explained that the Complainant responded to an
article in the Rockland County Times by saying,
"If they said I said that, I'll put his freaking head
through the wall." She then shared information
about a prior incident in which she had put
someone's head through glass. He said he told her

that it is understood that the article was not
referring to her because the incident occured
before she started in her position.

Mr. Yagel stated that there were concerns about
the Complainant's performance. He said that she
has on her resume that she dealt with securities,
but she struggled to with the prices for the fees
and understanding basic figures. As an example,
he relayed that he was at Village Hall and he
observed the Complainant giving the incorrect
amount for the fee for an application. He asked
her if she was sure that was the correct fee and
she replied, "Yes." He said he told her that the
amount she gave was incorrect and he showed her
the correct fee.

Mr. Yagel added that the Complainant's
communication letters were not professional and
she went contrary to instructions. For example,
she sent out a death notice, but the letter did not
have the name of the identifying agency, name of
the person who had passed away and the correct
death date. Therefore, it was unknown whether
the information was ever received.

Mr. Yagel also stated that the Complainant did
not get permission from him or the board prior to
making decisions. For instance, the Complainant
met with an intern from the Solid Waste
Commission and authorized an application for the
roll out of a program. However, when he became
aware of it, he checked and the information, such
as the collection date, was incorrect. The Mr.
Yagel said the incident occurred around July 2016
and screen shots with information about the
application were previously submitted to the
Investigator. Mr. Yagel further noted that the
Complainant did not take criticism well.

He described the Complainant as being
insubordinate. He provided as an example of her
insubordination an incident in which the
Complainant was on the phone disclosing
information that was not was inappropriate. He
said he asked her to place the call on hold several
times, but she did not comply with his request.
He relayed that the incident was witnessed by the
Village Clerk, Frances Artha.

Mr. Yagel said that the Complainant would
inappropriately give out information about a case
before trial. For instance, he cited a person
(Naomi) for the placement of 8th framed placards
that were incorrectly placed in the road, when
Naomi came in about the citation, the
Complainant divulged to her that she was not the
only one who was cited. The Complainant told
Naomi that Fuerst and Fuerst was also cited. He
added that Naomi also claimed discrimination, but
she later plead guilty to the citation.

Mr. Yagel stated that the Complainant does not
like to follow the law. He cited an email in which
the Complainant chastised the building inspector

for not being helpful as an example. Mr. Yagel said he met with the complainant to discuss the matter and she said, "We need to work together, not screw people." Mr. Yagel said, "The poorest choice I ever made was hiring Noreen Shea."

When asked how the Complainant came to work for the village, the Mr. Yagel replied, "I met her at a friend's function and Trustee Nicholas Wilson knows her sister and her brother-in-law.

Mr. Yagel answered, "Around 1½ month after she started; around the end of 2016 when asked how long after hiring the Complainant did the event take place. Mr. Yagel was asked how much time had passed before issues with the Complainant were observed and he said, "From the get go. She wanted to figure out other's job, e.g., the clerk." Mr. Yagel said he told Fran to do the property registration form because the Complainant could not do it properly.

Mr. Yagel stated that around the March 2017 elections, the Complainant threatened to put Trustee Bank's head through the wall. Mr. Yagel said he informed the Complainant that her statement was a threat. Mr. Yagel also relayed that in April 2017, he had done some appointments and he later noticed that no none had signed the oath of office and so, he asked Fran to check to make sure everyone signs.

Mr. Yagel said he decided not to reappoint the Complainant because of her incompetence, insubordination, threats against an elected official, her inability to get along with staff, her lack of filter, and her giving out inaccurate information. He added that he did not have to give the Complainant a reason for his decision not to reappoint her. He said the Complainant made disparaging remarks about Fran, such as calling her "Debbie Downer" and "Hanna Rain Cloud."

Mr. Yagel stated he is not at the village hall daily because he is a part-time mayor. However, the concerns about the Complainant were brought to his attention by the trustees, building inspector, village clerk and residents.

Mr. Yagel said that in June 2017, in response to the text he received from the building inspector about a conflict with the Complainant, he asked Deputy Mayor Leon Harris what he saw and he instructed him to find out what is going on.

Mr. Yagel said the Complainant was the second person whom he decided not to appoint for a position. He said that Peter Obey, who was on the ZBA (Zoning Board) was being considered, but he decided against it after observing a discrepancy with a bid and the reported amount.

Mr. Yagel said interviews for the Deputy Clerk position were not done at the village hall. Mr.

Yagel was asked if interviews were conducted prior to notification to the Complainant that her service was no longer needed and he replied, "Yes. Well before."

Mr. Yagel was asked if he told the Complainant to stop being cooperative with certain Jewish residents and he answered, "Absolutely not; however, I observed her give information without due diligence, and without reviewing the request, i.e., FIOL request."

Mr. Yagel was asked if he advised the Complainant to buy and place pork rinds on the counter. He replied, "No. I do not recall saying that to her."

Mr. Yagel was asked if he told the Complainant to stop saying how cute people's children are and to stop interacting with those types. He responded, "No, but I recall the incident in which she was interacting with someone from Tal Properties in Pomona and I said to her, 'Don't you know we are in litigation?' I told her not to elaborate on anything."

Mr. Yagel was asked if he had sent a text to the building inspector in which he called the Complainant a "Jew lover?" He answered, "Absolutely not."

When asked if he would like to add any additional information, Mr. Yagel said that being a public official, you do not have free speech and things are said in the media/blog; I just ignore and move on. He also said that the 2007 Wetland Law was the only one on which he voted and at the time, 3/5th of the board was Jewish.

Mr. Yagel was asked his religion. He asked is that important. He was told that based on the nature of the complaint, it was. He responded, "Lutheran Christian." He added that the Complainant went to Sacred Heart and his children graduated from Sacred Heart.

Mr. Yagel was informed that the plan is to wrap up the case by early March.



Name: Noreen Shea v Village of Pomona (1)

Events (32)

MOU Agency
Witness Interview
In Person
Tue 2/27/2018
Completed
5/15/2018
Case Number    : 10190879
HUD Number    : 16GB800346

Case Name            : Noreen Shea v.
Village of Pomona

Witness Name            :
Frances Arsa Artha
Witness Address        : Pomona
Village Hall
Witness Telephone    :

Date of Birth (If age is alleged)  :

Date of Interview    : 2/27/18
Method of Interview   : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary   :

Witness Frances Arsa Artha was interviewed.
She was accompanied by Doris F. Ulman,
Attorney for the Village of Pomona. She is
currently serving as the Village Clerk/Treasurer.
She stated that she reports to the Mayor and she
started working for the village on 12/1/14. She
has not held any other public position. She
previously worked for the private sector as a Tax
Accountant.
She was asked to describe the duties of the
Deputy Village Clerk. She replied that the Deputy
Village Clerk is responsible for the packages and
serves as a back-up for the Village Clerk.
Witness said, "Yes" when asked if she had seen
the complaint the Complainant filed against the
Village. She was asked for her response to the
complaint. She stated, "I was shocked when I saw
it. It is inaccurate. It was off base and untrue."
She further relayed that the Complainant did not
understand the job, the requirements and she had
behavioral issues. She said the prior Deputy
Village Clerk trained the Complainant for a week.
Witness relayed that a week was not enough time,
but the former Deputy Village Clerk spent a week
with Complainant. Witness surmised that job is a
repetitive and routine process.
Witness was asked to provide her assessment of
the Complainant's performance. She stated,
"Three months after she started working she was
difficult to deal with, she did not take criticism
well, and she was overall difficult to work with."
She described the Complainant as being
oppositional to any kind of guidance or
instructions she tried to give her. Instead,

LawManager®

Complainant would say she (Artha) was being picky or it did not matter. She added, "It was not just me; she had the same difficulties dealing with others inside and outside the Village." She provided an example of the Complainant's telephone conversation with an Orange & Rockland staff, Trish Austin, about a light post for which the light was not working, and after which, Complainant described the Orange and Rockland staff as useless. Witness said she was surprised by the Complainant's comments because she (Artha) had worked with the Orange and Rockland staff several times without incident. Furthermore, witness stated that the Orange and Rockland staff called back with an update, but asked for a message to be given to Complainant because she did not wish to talk to the Complainant.

Witness said the Complainant did not previously mention the claims in her complaint. She said the Complainant's employment was terminated because of her office demeanor, 2

her outburst of anger, she is belligerent, condescending, and she did not assume responsibility for her interaction with others. Witness was asked to clarify to whom "we" in her affidavit referred. She replied, "Myself, Building Inspector and Mayor observed certain behaviors." Also, witness reported that residents commented about the Complainant's conversations in the supermarket. Witness was asked when the outside conversations took place and she said, "A period of time. The Mayor made informal comments that village information should be kept confidential." Witness was asked if she has anything in writing about the Complainant's performance; she replied, "Specifically. No. I don't know if I have anything in here," referring to a letter she had. She explained that the letter is in response to one that was retrieved after from the Complainant's computer in January 2018, in preparation for the case. She said the letter was about her and so, she wrote a response to the letter in case she needed it. Witness said she had not shared her letter with anyone. The investigator asked for a copy of the witness' letter and she provided it

Witness said that people were being interviewed for positions and when one person came in, the Complainant asked, "That's the person who is going to replace me? I said, I don't know; also hiring for codes."

Witness disclosed that on 2/3/17, the date of the 50th anniversary celebration, Complainant was on a call with a contractor, the Mayor told her to put the call on hold, but she did not do it. Witness said, "It was quite a dramatic level of insubordination." Witness said the celebration was being held downstairs at the village hall, but after the telephone incident, Complainant refused to join the celebration and she said, "I would be caught dead before I go down there." Witness noted that people can have disagreements, but there is a way to handle it.

Witness reported that Complainant would give a

lot of information to real estate agents and she told her she should not do it. She further reported that a building contractor, whom she did not name, visited when Complainant was not in the office. He asked for her, but was told she was not in. He then said, "She is a big problem; she gives out a lot of information."

Witness stated Complainant said she smashed more than one face in a windshield and Complainant talked about a mall incident in which Complainant was with her mom when someone bumped into her mom; consequently, pushed the person's head in a glass case and the complainant said she had blood all on her.

Witness said she initially gave Complainant a lot of direction, but Complainant seems to have problem remembering things. For example, Complainant had to send certified mail for the building department, but she did not know how to do it. Witness said she showed Complainant how to do it, but she did not do the certified letters correctly. Witness said she became aware that the letters were not done correctly when Complainant told her she had not received any of the return receipts. Witness said Complainant asked her a second time to show her how to do it and she showed her. 3

Witness also presented an example as Complainant's completion of the tax projects that occurred the first three months of Complainant's employment. Witness said she showed Complainant how to do the tax projects, she asked Complainant to count cabinets to get locks for them and within 5 minutes, Complainant was on the phone telling the guys that the bars did not fit. Witness explained that the bars did not have to fit the entire length of the cabinets. She, therefore, told Complainant she only needed to count the cabinets. In response, Complainant, threw up her hands, threw paper at her and told he that maybe she needs to do it herself; she can do it better. Witness said Complainant used derogatory terms, such as, cold hearted Hannah, Debbie Downer, about her. Investigator asked her how she knew the terms were used, and she said, "An email to the building inspector, who showed it to me." Investigator asked witness for a copy of the email; she said she did not have it, but maybe the building inspector has it. Witness reported that when she met with her, Complainant would say to her, "You Ms. Perfect or you are so picky." Witness said, "I withdrew myself. It was easier to do things myself than deal with her." Investigator asked witness if the building inspector showed her anything else; she replied, "No." Witness was also asked if the building inspector showed her any texts; she said, "No."

Witness said she gave the Complainant instruction, but she cannot seem to follow it. She relayed that in preparation for vacation, she gave Complainant information on the tax system used to enter tax payment. However, she left the office early for a dental appointment, Complainant called her for assistance with someone's tax

payment and she had to walk her through it. She also reported that Complainant informed her she was worried the person was going to pay by credit card because she never bothered setting it up. Witness said Complainant also never did the notary and she did not attend board meetings until about a year later.

For another example, Witness relayed an occasion in which someone called Complainant about a death certificate and Complainant told him to come in. However, the information was incorrect because the accident which led to the death occurred in front of the post office and so, the death certificate would not have been issued by village hall. Witness also referred to two deaths which occurred while she was on vacation and Complainant sent the death notification letters without any address on the letter. She also said that the people died in July, but the letter was dated June. She reported that Complainant told the funeral director that no one told her.

Witness was asked who terminated Complainant's employment; she answered, "The Mayor." She was asked if she had any discussions with the Mayor about Complainant's termination and she said, "Not really. I told him about instances. I made him aware of her performance issues." She gave an example of a letter to residents about property registration Complainant completed which Witness had to redo because it had spelling errors. Witness was asked the reason the Mayor terminated Complainant's employment. She replied, "Not conducting herself in a professional manner. He did not discuss it with me; I was not aware." Witness was asked when she became aware and she said, "The 4

day he did it - 6/23/17. Witness was asked if she knew a replacement was hired and she said, "No. The Mayor told me after she left someone will be starting on Monday."

Witness was asked if the Mayor called Complainant a "Jew lover?" She answered, "No." Witness was asked if she observed Complainant treat anyone requesting services differently. She answered, "She would react to people differently. If she did not like someone or if the person is argumentative, she was less cooperative. She liked to talk a lot with people during certain calls." Witness also said that Complainant would initiate conversations. For example, if a person has a certain car, she would initiate a conversation about the car and she would have inappropriate conversations with people who came in village hall. Witness did not provide any examples of the inappropriate conversations. Witness was asked if Complainant was told to stop being friendly with Jewish residents and she replied, "No. She was told to follow protocol. "Witness said Complainant would OK residents to do something without the building inspector's approval, and so, Complainant was told to follow building code. Witness was asked if the Mayor told Complainant how to handle "those people." She responded, "She was told to be professional and don't act

Events (32)

unilaterally on a decision that she does not have
permission to act upon. She had disregard for any
kind of rules or codes." She added that
Complainant told someone that a permit was not
needed to move a water heater. When
Complainant was told that a permit was needed,
she indicated that she had moved 100s of them
and she did not have a permit.

Witness disclosed that Complainant did not like
the job and she thought it was beneath her. She
said Complainant told someone who came in that
she used to have her own jet and she rubbed
shoulders with Bernie Murdoch and now look
where she is; she is stuck in this job.

Witness was asked if the Mayor told Complainant
to buy pork rinds. She answered, "No; never
heard anything like that."

Witness was asked whether it is common
knowledge of an Us vs. Them environment in the
office. She said, "No. It is a very diverse
community; people from different backgrounds."

Witness was asked if she discussed with anyone
about the interview with the investigator. She
replied, "No. Just the attorney. I met with the
attorney yesterday." She was asked if anyone else
was present during the meeting with the attorney;
she said, "No."

When asked if she would like to add any
additional information, Witness said the Village,
Mayor, Board of Trustees are working to maintain
the village and the quality of life. She added that
the for 50th anniversary celebration, a lot of effort
was made to include everyone, which is why she
the Complainant's allegations are shocking
because they are not true. Witness disclosed that
the Complainant never brought up anything like
that to anyone and the Complainant called
everyone, except her "Hun."

Events (32)

|  | MOU Agency |
|  | Witness Interview |
|  | In Person |
|  | Tue 2/27/2018 |
|  | Completed |
|  | 5/15/2018 |
|  | Case Number : I0190879 |

HUD Number : 16GB800346

Case Name : Noreen Shea v.
Village of Pomona

Witness Name : Leon Harris

Witness Address : Pomona
Village Hall
Witness Telephone :

Date of Birth (If age is alleged) :

Date of Interview : 2/28/18
Method of Interview : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary :

Witness Deputy Mayor Leon Harris was
interviewed. He was accompanied by Doris F.
Ulman, Attorney for the Village of Pomona.

Mr. Harris stated that he was appointed as Deputy
Mayor in April 2014 and he was reappointed in
the 2015 elections. His other elected position was
in 2011 as Trustee.

Mr. Harris said he has not seen the complaint, but
he has knowledge of it.

Mr. Harris reported that he is familiar with the
Complainant who worked as Deputy Clerk. He
relayed that he told the Complainant that she has
one of the easier jobs because she can contact
someone when a difficult decision must be made.
He added that he told her she could always call or
text the Mayor to ask him what to do. Mr. Harris
said he told the Complainant she was taking on
too much responsibility. He reported that the
Complainant did not like what he said. She was
upset that things were not going well and she said
that everything she does is wrong.

Mr. Harris disclosed that he had witnessed a
telephone conversation between the Complainant
and a builder in which the builder called in the
afternoon to request an inspection the following
morning. Mr. Harris said he informed the
Complainant to tell the builder that 24-hour notice
is needed to schedule the inspection. Mr. Harris
stated that the Complainant did not want to tell
the building, and so, he did it. Mr. Harris

By: rcaquias

reported that he advised the Complainant to tell people she would get back to them if she did not have an answer for them.

Mr. Harris was asked if he had knowledge that the Complainant's services were terminated. He replied that he knew the Mayor had not renewed her term because it had the term been renewed, it would have been brought to the board. Mr. Harris was asked if the Deputy Clerk position had to be brought to the board and he said, "Yes." Mr. Harris was asked what was his response when he found out that the Complainant's term would not be renewed. He responded that the Mayor told him it was not working out. The Mayor then put in the name of the current Deputy Clerk for nomination by the board.

Mr. Harris answered, "No" when asked if he had a discussion with the building inspector about the Complainant. Mr. Harris was asked whether there was a complaint from the building inspector about the Complainant which he was asked to intervene; he replied "No." (Footnote: During his interview on 2/23/18, the Respondent said the building inspector complained about the Complainant and he (Respondent) asked Deputy Mayor Harris to look into the matter).

Mr. Harris said he is unaware of the Respondent calling the Complainant a "Jew Lover." He also said that he is unaware of the Respondent having made any statements about the treatment of "those people" in reference the Orthodox Jewish community. Mr. Harris said, "No" when asked whether there were delays in authorization for requests from the Orthodox Jewish community. He further noted, "I have seen people say I want this right away and people saying you have to wait." He expounded that it is a three-member office and lately (a couple of months), there have been a lot of FOIL requests for records for two/ three years, which takes a lot to time to collect.

Mr. Harris answered "No" to the question whether there was a directive from the Mayor to put porkrinds on the counter. He also responded, "No" when asked if there was any direction from the Mayor not to provide effective service to the Orthodox Jewish community.

Mr. Harris also said he has not heard about a "Us vs. Them" environment. He said the comment may be from the Orthodox saying that things are difficult. Mr. Harris added that the Mayor is telling everyone to follow the process. Mr. Harris was asked whether the subject of following the process came up in discussions; he replied, "No. The Mayor told me he has told everyone to follow the process."

Mr. Harris was asked if his assessment was that



Events (32)

the Complainant was too cooperative with the
Jewish Community. He replied, "No. At times,
she was not fully aware of the laws and what
needed to be done."

Mr. Harris was asked his religion and he
disclosed that he is Catholic.

Events (32)

MOU Agency

Witness Interview

In Person

Wed 2/28/2018

Completed

Date Completed 5/15/2018

Case Number : 10190879
HUD Number : 16GB800346

Case Name : Noreen Shea v.
Village of Pomona

Witness Name : Ian Banks

Witness Address : Pomona
Village Hall
Witness Telephone :

Date of Birth (If age is alleged) :

Date of Interview : 2/28/18
Method of Interview : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary :

Witness Trustee Ian Banks was interviewed. He
was accompanied by Jan. Ulman, Attorney for the
Village of Pomona.

Mr. Banks stated that he has served continuously
since he was elected as Trustee in 1996, his first
and only elected position.

Mr. Banks said he is familiar with the complaint
and he has read it.

Mr. Banks was asked to relay what he knows
about the Complainant's employment. He replied
that the Complainant did a good job for the
village. She was professional and feedbacks from
the village residents were positive. He said she
was eager to be productive and all tasks she had
to do, she always did a good job. He added that
he never received any negative feedback about
her job duties from the residents.

Mr. Banks was asked if he gets any negative
feedback about the Complainant from anyone.
He stated, "Certain officials in the village: it came
up in building meetings." He further noted that
the Complainant told him she was frustrated and
the Complainant sent around two memos in which
she reported that she was trying to get her job
done, but she was lacking in instructions, and
access to computers. He said she reported that the
building files were in disarray, she had problems
getting access to files and receiving training. Mr.
Banks stated that the Trustees like to see the
office runs smoothly, and so, he tried to work

with the building department to address the Complainant's concerns. However, no follow-up discussions were held with the board to get things straightened out for the Complainant to do her job.

Mr. Banks was asked if anyone complained to him about the Complainant's performance and he said, "Doris Ullman reported once to the board that everyone was quibbling." He was asked if the Mayor complained about problems with the Complainant and her replied, "No."

Mr. Banks described the Complainant as being aggressive. He explained that the Complainant previously had some high level, stressful jobs; therefore, she likes to do thing fast and she wanted and needed to do work. He also assessed that "she is a capable person, but there were some bumps for her to manage the system we have." He also stated that the Complainant is extremely credible. She does not play games and she does not lie.

Mr. Banks was asked if the board had confirmed the Complainant's appointment. He replied that he was not sure. Mr. Banks was asked if the board confirmed the current Deputy Clerk's appointment; he said, "No." The witness was asked whether he or the Trustees were consulted about the Complainant's termination; he said, "No." He reported that he found out about the Complainant's termination from her and he believed she called him the day of the termination. He was asked if he had done anything when he found out about the termination and he replied that he remember making some calls to confirm it. He was asked if he spoke to the Mayor about it and he said, "No; not after the termination." He added that prior to the termination, "There were rumors floating around that she would be terminated." He explained that the Complainant and residents, who had heard from other employers, rumored that her employment would be terminated. He said he was not surprised about the termination because the Complainant was not reappointed. He noted that some people may continue working for years without being reappointed, but it is not a surprise when a person who was not reappointed is terminated. He said he was surprised the Complainant was not reappointed because everyone thought she was doing a good job.

The witness was asked if he had heard any other types of rumors about how the residents are treated. He responded that the Complainant said she had been criticized for providing documents to the residents too quickly and she was told that she should not be doing it. Mr. Banks further noted that the residents were happy because they were getting things that they needed, and they had heard she was criticized for doing her job. He reported that Jewish residents have problems getting their documents quickly. The Complainant treated everyone the same way,

LawManager®

namely, information went out quickly. However, the Mayor did not agree with her approach and the Complainant reported that she was criticized for doing her job.

The witness was asked if residents complained to him prior to the Complainant's arrival. He replied, "Yes." He stated that, recently, a lot of the complaints are about what is going on with the building department. He said he attended a meeting in which he heard residents talk about permits, plans approval, certificate of occupancy, and stop work orders. He was asked who complained and he replied, "Pretty much all the Jewish residents." He stated that he also gets telephone complaints from residents about drainage issues and plans being followed. The witness indicated that the Trustees do not always get the information about plans not being followed. The witness was asked if he received complaints from non-Jewish residents. His response was, "Fewer, but a large percentage of the residents is Jewish. He said the residents have historically been Jewish, but there has been a recent change in the demographics, i.e., there are more Orthodox Jews. Mr. Banks also stated that he could not recall the non-Jewish residents' complaint, but he is sure they were some.

The witness answered, "She told me" when asked if he is aware of any information about the Mayor calling the Complainant a "Jew lover." He was asked specifically what she told him and he replied, "She said the term 'Jew lover' was used by the Mayor and the building inspector." He was asked if he had made any inquiries about the use of the term and he said, "No. I did not bring it up in a meeting. I may have mentioned it to the Jewish residents." He added that a fellow Trustee, Robert Klein, is Jewish.

Mr. Banks was asked if he knows about any reference to "those people" by anyone in the office. He said the Complainant told him it had occurred. He was asked if he had made any inquiries into the matter and he said, "Not that I can recall."

He was asked if he has any knowledge about the directive to buy pork rinds and he said, "I read about it in the complaint, but I did not witness it. I don't have any information about it."

Mr. Banks reported that, to the best of his recollection, he believes the Complainant had informed him about the "Jew lover" and "those people" comments prior to the termination of her employment.

He was asked if he had knowledge about an "Us vs. Them" operating model at village hall and he responded, "I'm a resident and Trustee. There is a division of employees, Mayor and people who don't agree politically or it could be religious beliefs. Additionally, Mr. Banks disclosed that a

Events (32)

resident does not speak at meetings because he is afraid of intimidation from the building inspector. Mr. Banks added that the Mayor uses intimidation and threats to get what he wants and he gets help from the building inspector, the clerk, and the village attorney, and possibly the engineer.

The witness was asked for his response to #11 of the complaint which reads as follows: "I believe Respondent terminated my employment because I provided competent, equal, and professional services to Orthodox Jewish investors, builders, and residents in contravention to Respondent's desired practice that I stop being too cooperative with certain Jewish residents of the village." He stated that the Complainant thought she was put under pressure if someone asked her something. She told him about a meeting she had with the Mayor and Deputy Mayor about how she was doing and during the meeting she was reprimanded. Mr. Banks said the board was not notified of the meeting. He stated that the Complainant may have been said to be outspoken and yelling at people; however, were one to see what the Mayor is capable of in terms of intimation, one would understand.

The witness was asked if he had any other information he wanted to share. He said that the village is very divided and criticism of the Complainant are from the Mayor and the people paid by the Mayor. He said the employees are not acting independently and they are being manipulated by the Mayor. For example, the building inspector, who should be independent, takes directives from the Mayor. He further disclosed that certain employees must do what the Mayor says or get fired like the Complainant. Mr. Banks also said, "If you don't follow what the Mayor says, you end up like me, having to go to court."

Mr. Banks stated that Trustees are now unable to get any important document from village hall. For instance, the Trustees are unable to get the report on FOIL requests that were denied, but the Trustees were previously able to get the report. He said the Trustees are also denied access to things needed to do their jobs, such as, requests to see the log of attorney fees.

Events (32)

MOU Agency
Witness Interview
In Person
Wed 2/28/2018
Completed
5/15/2018
Case Number    : 10190879
HUD Number    : 16GB800346

Case Name                  : Noreen Shea v.
Village of Pomona

Witness Name                    : Betty
Vanderbeek

Witness Address                 : Pomona
Village Hall
Witness Telephone             :

Date of Birth (If age is alleged)   :

Date of Interview   : 2/28/18
Method of Interview   : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary   :

Witness Betty Vanderbeek was interviewed.  She
was accompanied by Doris F. Ulman, Attorney
for the Village of Pomona.

Witness Vanderbeek stated that she was
appointed as the Deputy Clerk for the Village of
Pomona in June 2017.  She was previously
appointed as the Building Clerk for the Village of
Airmont from September 2016 to May 2017.

Ms. Vanderbeek said she was initially interviewed
by Mayor Yagel in mid-January 2017 for the
Deputy Clerk position, but she told him she would
get back to him.  She interviewed again for the
position in June 2017.  She stated, "During the
January interview, Fran came in for about 5
minutes, she seemed unprepared and it seems she
did not know I was interviewing."

She was asked where the interview was conducted
and she replied, "The village hall." (Footnote:
During his interview on 2/23/18, the Respondent
said the interviews were not conducted at the
village hall).  She responded, "No" when asked if
the Complainant was present when she
interviewed for the position. She reported that she
met the Complainant once at a GIS training, but
she could not remember the date of the training.

She stated she left her prior position in May 2017
because Airmont needed a full-time building
clerk, she was part-time and she could not get the
full-time position because she was not a civil

Events (32)

servant. She disclosed that the Mayor reached out
to her to ask her if she was interested in becoming
the Deputy Clerk.

Ms. Vanderbeek was asked if, prior to the
commencement of her employment, if anyone
else talked to her about the position; she replied,
"No." She was asked if the building inspector
talked to her about the position before the Mayor
contacted her; she replied, "No." She said after
her position with Airmont ended, she did not
think of going back in government. She was
looking in corporate for positions. She relayed
that she knows the building inspection prior to
starting her current position because she was his
clerk in Airmont.
Ms. Vanderbeek stated that she did not know that
the Complainant's position was terminated and
she does not know when the position was
terminated, but she assumed it was sometime in
June 2017 before her arrival.

She was asked what she was told about the
position. She stated that she was told she would
be doing code, planning, zoning and helping the
village clerk with whatever help was needed

She answered, "No. I came knowing the building
department" when asked if she received any
training.

She was asked to whom she reports and she
replied, "It depends on the job; either Fran or
Lou." She was asked if she reports to the Mayor
and she said, "No." She also said, "No" when
asked if she receives directions from the Mayor.
She added that the Mayor may ask her to look
into situation in the village and if she knows
anything about it. Ms. Vanderbeek further
responded, "No" when asked if the Mayor told
her to answer the phone or place a call on hold.

She was asked if she discussed the Human Rights
Commission interview with anyone and she said,
"No." She amended her response to clarify that
she told Fran because Fran would have been left
alone in the office, but she did not provide her
with any details. She also spoke with the attorney.



Name: Noreen Shea v Village of Pomona (1)

Events (32)

| | |
|---|---|
| | MOU Agency |
| | Witness Interview |
| | In Person |
| | Wed 2/28/2018 |
| | Completed |
| Date Completed | 5/15/2018 |
| Comments | Case Number : 10190879 |
| | HUD Number : 16GB800346 |

Case Name : Noreen Shea v.
Village of Pomona

Witness Name : Nicholas
Wilson

Witness Address : Pomona
Village Hall
Witness Telephone :

Date of Birth (If age is alleged) :

Date of Interview : 2/28/18
Method of Interview : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary :

Witness Trustee Nicholas Wilson was
interviewed. He was accompanied by Doris F.
Ulman, Attorney for the Village of Pomona.

Mr. Wilson stated that he was appointed as
Trustee in October 2013 and he was elected for
the position in March 2014. He held no other
similar position.

Mr. Wilson said he has not read the complaint,
but he is familiar with it.

Mr. Wilson was asked what he could tell the
investigator about the Complainant's work. He
disclosed that the Complainant had worked at the
village hall for about 1 ½ year and she seemed
frustrated with her position. He added that she
mentioned that she was unable to make decisions
without going to supervisors and she did not have
enough responsibility. Mr. Wilson was asked
how he responded to the Complainant's
statements. He said he told her to ask if she has
questions and if she does not receive any
response, she should send an email in which she
includes the Mayor. He was asked why he
informed the Complainant to include the Mayor in
the email; he replied that the Mayor oversees
personnel.

Mr. Wilson was asked if anyone consulted him
about the Complainant's job. He answered that he
was asked how they were getting along and he
said she seemed frustrated. The witness was asked


Events (32)

if the Deputy Mayor was asked to investigate the Complainant and he answered, "No. I'm unaware."

Mr. Wilson was asked how he found out the Complainant's position was terminated and he responded, "Probably from the Mayor." He said he does not know when the Complainant's employment was terminated.

The witness answered, "No" when asked if he is aware of any information about the Mayor calling the Complainant a "Jew lover." He responded, "I don't know what that means" to the inquiry whether he was aware of any information regarding the Complainant or any other employee handling requests from "those people." He was asked if he is aware of Orthodox Jews being treated different, such as, delay in the issuance of permits until the last day of the request. He answered, "No." Mr. Wilson was asked if he heard anyone complain that the Jewish residents were being treated different; he replied, "No." He also answered, "No" when asked if he has any knowledge about any directive to buy pork rinds.

Mr. Wilson was asked if he knows about an "Us vs. Them" environment at village hall and he responded, "Absolutely not." He was asked if he had heard any information that the Complainant's employment was terminated because she was too associated with the Jewish residents; he said, "No."


Name: Noreen Shea v Village of Pomona (1)

Events (32)

[redacted] MOU Agency

[redacted] Witness Interview

[redacted] In Person

[redacted] Wed 2/28/2018

[redacted] Completed

[redacted] 5/15/2018

[redacted] Case Number : 10190879
HUD Number : 16GB800346

Case Name : Noreen Shea v.
Village of Pomona

Witness Name : Louis Zummo

Witness Address : Pomona
Village Hall
Witness Telephone :

Date of Birth (If age is alleged) :

Date of Interview : 2/28/18
Method of Interview : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary :

Witness Building Inspector Louis Zummo was
interviewed. He was accompanied by Doris F.
Ulman, Attorney for the Village of Pomona.

Mr. Zummo stated that he was appointed as
Building Inspector in November 2013. He works
part-time, 15 hours/week. He has also been the
Building Inspector for the Village of Airmont
since July 2016. He stated that he received
training/orientation for building inspector, and in
July 2014, he received his certification for Code
Enforcement Officer by the Department of State.
He said he completed 124 hours training to obtain
the certification and he must complete 24 hours
continuing education credits annually to maintain
his certification.

Mr. Zummo said he had seen and read the
complaint.

Witness was asked if he receives text from the
Mayor; he replied, "Sure. On my personal, but
primarily on the village phone, which I received
two years ago." Investigator asked Witness for
the phone number for his village phone; he said, 'I
don't know it. Ask Fran; she would know."

Witness was asked if had shown Complainant a
text from the Mayor in which the Mayor referred
to Complainant as "Jew lover." He replied, "I
doubt highly I would have done that. The Mayor
does not work like that." Witness was asked if he
showed Complainant an email from the Mayor
with the term "Jew lover?" He responded, "Not

that I know of. No." Witness was asked would
the Complainant be lying had she made such a
statement and he said, "If I did not show it to her,
I guess she would be."

Witness was asked if there are delays in the
processing of requests for permits. He responded
by delineating the steps for obtaining a permit -
permit application, insurance from contractor,
clerk review, and data entry in the system. He
said that he reviews the request in the computer
and alert the clerk when it's ready to go. He
added that processing for some permits may take
longer, i.e., ones that require drawings or
plumbing.

Witness was asked if the Mayor directed him to
issue stop work orders and he replied, "No. He
has asked, but unless I find it valid, I do not issue
it. I'm the only person authorized to issue stop
work orders." Witness was asked if a stop work
order was issued for Mr. Klein and he replied,
"No." However, he stated that Mr. Klein had two
issues with his permits: Improper drawings, i.e.,
the house being built did not match the drawings
for the permit, and an extra floor was added, i.e.,
the drawings were for two floors, but the house
being built has three floors. Witness said he
became aware of the matter when he drove by the
house. Witness was asked if prior to driving by,
had he received any directive from the Mayor
about any of the work. He responded, "No." He
added, "He asked me to investigate things that are
going on in the village, but the Mayo cannot ask
me to issue stop work order because the building
inspector position is like that of the police; the
Mayor cannot tell him what to do. He said others,
such as Trustees Klein and Banks have asked him
to investigate issues/concerns they had.

Witness was asked if there is a timeframe for
issuing permits. He said, "As fast as we can.
There is a 30-day window, but it is a village code,
not a State law and there is no penalty for not
issuing a permit within the 30 days. He added that
sometimes the village engineer has to sign off,
which may take longer for the request to be
approved, but most applications take less than 30
days."

Witness was asked about the existence of a "Us
vs. Them" operating model at the office and he
stated, "I do not see any attitude. I am there to
service the residents. There is uniformity with
everybody."

Witness was asked if he had done an inspection of
Mr. Banks barn. He said, "Yes." He was asked
the reason and he replied, "He has three open
permits for almost 12 years. I inspected the
property six or seven times. The permit for
electrical wiring was closed in 2014. The permit



Events (32)

for the barn was opened in 2014. The drawing
was for a 1.5 story horse barn, but what was being
built was a 3-story structure with an office."
Witness said Mr. Banks was given a year to
correct the concerns, but he still has problems
with stair joists, insulation removal, verification
of the height, hurricane clips and tying the roof,
and wall structure. Witness added that the Zoning
Board of Appeal's list of deficiencies were the
same as the list from Mr. Banks' architect.
Witness said he could submit to the Investigator
letters he has on file which lists the concerns.

Witness was asked whether he had said the Mayor
would be pissed because the barn had passed
inspection. He replied, "No. He passed all the
inspections, except the one he did not do."
Witness was asked if the Mayor told him to find
something wrong with the barn and he responded,
"No. The deficiencies were similar to the ones
from Mr. Banks' architect." He was asked when
he last inspected the barn and he said it was
almost a year ago. Witness was asked if anyone
else inspected the barn and he said," The Village's
back-up architect, Mr. Brady, who works for the
Village of Haverstraw." Witness was asked the
outcome of Mr. Brady's inspection and he said,
"Brady and I measured the height of the barn and
it was too tall; the special permit from 1998,
provided a tolerance for height, but it too tall - 28
feet." Witness was asked if he had told anyone
about the barn's height and he said he had told
Mr. Banks and the office staff. He was asked if
he told the Mayor. He responded, "I don't
remember telling the Mayor. No. It might have
come up in a meeting. I don't recall." Witness
was asked if after the outcome of the barn
inspection, did the Mayor thank him for making
his year. He replied, "No. That would have been
special." Witness was asked if a certificate of
occupancy was issued for the barn and he said it
was not. Witness disclosed that Mr. Banks has
brought an Article 78 case against the Village.

Witness was asked if he had conducted
inspections for Mr. Klein's property and he
replied, "Yes." He was asked what transpired
during his inspections. He said he had conducted
multiple inspections of the property because there
are multiple concerns. For example, sprinkler
issues because the property being built is a 3-story
structure, which is illegal in New York State
without a sprinkler system. Therefore, a permit
was not issued because Mr. Klein did not have a
sprinkler system for the structure. Therefore, Mr.
Klein wanted to bring the matter to the Zoning
Board of Appeals (ZBA), but it required a denial
letter for him to do so, but Mr. Klein did not have
one because he was not issued a permit. Witness,
however, added Mr. Klein was later given
permission to appear before the ZBA because in
January/February 2016, Complainant issued him a
permit that Witness did not sign. Witness said it
was relatively easy for Complainant to have
issued the permit without his signature because

she was the ZBA Clerk. Witness said he would
find out about permits Complainant issued when
he when was reviewing the file. He said when he
spoke with Complainant about issuing permits
with out his signature, she said, "They needed it
right away and you weren't there." Witness said
that when he found out what Complainant had
issued Mr. Klein a permit, he notified the ZBA
that Mr. Klein did not meet the qualifications to
appear before the ZBA.

Witness was asked if he had issued a stop work
order for Mr. Klein's property. He replied, "Yes.
The home being built did not match the blueprints
because a foundation was added and the garage
was moved forward. Witness explained that the
addition of the extra floor required a sprinkler
system, but the home being built did not have
sprinklers." He added that Mr. Klein currently
has a violation because he continues to build even
though he was issued a stop work order. Witness
further noted that Mr. Klein was issued four
violations last year for grading his property
without a permit, dumping 200 yards of dirt,
dumping weeds in the middle of the road, and
other stop work orders. Witness noted that he
issued a stop work order to Village Hall for
repairing the roof without a permit.

Witness was asked if the Mayor ordered the
inspection of Mr. Klein's home. He replied, "No.
He cannot. It is not possible. Inspections are
scheduled by the resident and the Clerk will
schedule inspections for violation searches and
tree inspections." Witness said Complainant
would schedule inspected for days he was not in
the office and the appointments were all over the
place.

Witness was asked if the Mayor asked him to
look into building issues for non-Jewish
residents. He replied, "Sure. All the time for
issues, such as garbage cans in the streets, and
down trees. Also, anyone, such as Board of
Trustees who sees it."

Witness was asked if he knew the reason
Complainant's employment was terminated and he
said he was not given an official reason. He was
asked what reason he was given and he replied,
"Honestly, I've complained to the Mayor to do
something about her."

Witness answered, "No. He usually puts candy
out. Why would he buy pork rinds" to the
question whether there was a directive from the
Mayor to put pork rinds on the counter.

Witness was asked to describe his relationship
with Complainant. He said she was his
in-house support staff, his representative when he
was not there, she answered the phones, took in
permits and put away files. He also indicated that
she did not take instructions well, she had a hard
time learning procedures and when he tried to

show her how it's done, she would call him Mr. Perfect. Additionally, he stated that when someone called, Complainant would leave a message without finding out the reason for the call, she could not type, and she was not computer savvy. Witness said he stopped giving Complainant work to type because her work had misspellings and grammatical errors.

Witness said the building system and tax system database must be regularly updated; the Complainant asked to do it, but what she did was all wrong. Consequently, he had to block her authorization in the computer because errors can lead to information not going to the right people. Witness said, "The best description for Complainant is a speedometer that goes from zero to 60; one moment she's very sweet and another, she's angry; when she didn't get it, she would go on a rampage." He stated that Complainant had anger issues and fits of rage. Witness was asked if he had talked to Complainant about his concerns. He replied, "Yes. I would stay after work and talk to her in the parking lot for hours and we have gone to the Copper Kettle Bar/ Restaurant [Copper Still in Pomona] after work. I tried to help her because I needed a clerk."

Witness was asked if he got along with Complainant. He replied, "Yes. We joked all the time." Witness was asked if he told Complainant the Mayor wanted to get rid of her and he answered, "No. I told her I wanted her to leave. I told her it was not working out." Witness said the Mayor told him to relax and he would talk to her. He said he was not privy to the information from their discussion.

Witness was asked about interviews that were conducted and he stated that multiple interviews were conducted for code enforcement to replace Melanie Gross, but he does not know what became of it. He said that Betty Vanderbeek is the current Deputy Village Clerk. He was asked if he knew when she interviewed and he answered, "No. I recommended her, but I did not hear anything about it. She used to be the Clerk for Airmont. She lost her job in December 2016. He was asked when she started as the Deputy Village Clerk and she said she started in June 2017.

Witness was asked if he had done impressions/ impersonations in the office and he replied, "Sure." He was asked if he had done impersonation of Jewish people. He responded, "Yes. Sometimes. I joked about how people were carrying on."

The Investigator asked the Witness if the Mayor ever directed him to work. He replied, "Only once. He said to come in on the weekend to do garbage.

The Investigator asked to view Witness' village telephone and Witness consented to the request.

Events (32)

The review showed only two text messages
between the Witness and the Mayor; however,
there were numerous email communication
between the Mayor and the witness. The
Investigator requested a copy of email
communication with the Mayor from 2/1/16 to
present to be submitted to the Investigator by
3/7/18.

By: rcaquias

Events (32)

MOU Agency
Witness Interview
In Person
Thu 3/15/2018
Completed
5/15/2018
Case Number   : 10190879
HUD Number   : 16GB800346

Case Name                    : Noreen Shea v.
Village of Pomona

Witness Name                  : Robert Klein
Witness Address               : Pomona
Village Hall
Witness Telephone             :

Date of Birth (If age is alleged)   :

Date of Interview   : 3/15/18
Method of Interview   : In person

Place of Interview (If In Person) : Commission on
Human Rights

Interview summary   :
Witness Trustee Robert Klein was interviewed.
He was accompanied by Doris F. Ulman,
Attorney for the Village of Pomona.

Mr. Klein stated that he was voted Trustee in the
March 2017 elections and his term started in April
2017. Mr. Klein said he had seen and read the
complaint and the Respondent's response to the
complaint. His property is located at 63 Halley
Drive, Pomona.

Witness was asked his assessment of the
Complainant's employment. He responded that
his only interaction with her was in his personal
life, namely, his submission of building
department applications and plans and she was
blamed for lost plans. He described her as a
"Happy go lucky person." He was asked if he had
heard anything about Complainant's performance
and he replied, "I believe the Mayor said she was
not appointed; she was not doing a good job." He
was asked if in his capacity as a Trustee, he had
heard anything about Complainant's performance;
he replied, "No. During her employment, I was a
Trustee for a short time, approximately April to
June 2017, and one day she was gone."

Witness stated, "The village's main control is the
village building department where if things are
not done right, people can get hurt." He added, "I
have gone through personal hell with the building
department. Things don't add up; I don't believe
that there is not foul play; and I have voiced my
opinion publicly." Witness said Complainant was
there during the initial part of his 2 ½ year home
remodeling project, which has been spiraling
downward. He described the mold, burst pipes

By: rcaquias

Events (32)

and sheetrock damage to his home which resulted
from his problems in working with the building
department. He said, "I'm a monkey in the
middle." He also said he during his struggle with
the building department, he suffered $150,000 in
damages to his home and he had to move out of
his home because of the mold. Specifically, he
said, he does not know about other Jews, but he
has his requests for permits have been held up for
5-6 months, and he was told his building request
would be reviewed the next day, but it took a
month, which resulted in thousands of dollars in
damages. He also reported that it took 5 months
for him to get a fence permit and when the
permits were ready, no one notified him; he found
out during a discussion with the village attorney.
Witness said the building inspector said he does
not have hours to do permits, but a review of his
timesheets showed that he works 40 hours weeks,
twice the number of hours for which he is
employed.

Witness disclosed that three people in the village
are responsible for the problems with the building
department and there is no one with whom to talk
about the problem. He said it's a dead end and the
only avenues seem to be legal, the route he has
taken. Although asked, Witness would not name
the three individuals to whom he had referred.

Witness was asked about the existence of a "Us
vs. Them" operating model at the village hall and
he stated, "It could be politically charged." He
also stated that he has received a citation for
garbage at 4 am on a Saturday. Witness added
that he did not have any leaves on his property, he
was given two tickets. The owner at 26 Halley
Drive in the village of Pomona had a huge pile for
3 weeks, but was not given a ticket. Witness
stated he took pictures and brought them to
village hall and the building inspector had been
on the block 20 times, he was given two tickets,
but none was issued for 26 Halley Drive. Witness
said he does not know the owner of 26 Halley
Drive. Witness said the village attorney also has
a lot of garbage on her property, but she was also
not ticketed for it.

Also, Witness discussed what occurred during his
recent visit to Village Hall. He said he brought in
a ZBA application, but the new Deputy Clerk
refused to accept his application. She told him
she was rejecting it and when he asked the reason,
she responded, "I don't care. I don't have time for
your shenanigans. You don't have 12 original
copies." He said he informed her that the
application indicated that 12 copies are required,
not
12 original copies. He said he asked her to stamp
his application and reject him because he needed
a rejection letter, but she refused to do it and she
screamed that he was harassing her.
Consequently, he asked the Village Clerk to
stamp his application, which she did. He later
received a rejection letter from the Village

By: rcaquias

LawManager*

Events (32)

Attorney. He said he understood the reasons the attorney delineated in the letter, but his experience with the Deputy Clerk when he attempted to submit his plan should not have occurred. The Village Attorney explained that the Deputy Clerk is new, she is in training, and she is from a town where things are done differently; however, in response to the witness's complaint, the Deputy Clerk was reprimanded because she does not have authority to reject plans.

Witness also reported that the new Deputy Clerk refuses to give him receipts for plans he submitted whenever he requests them from her. He said if she refuses to give him a receipt, he would sit for a while, and she would type a Microsoft form and give it to him because she realized he would not leave.

Furthermore, Witness said 5 plans he submitted to the village have disappeared since the arrival of the new Deputy Clerk. He said he cannot understand how the Village does not have a record of his plans because inspections were done, which could not have occurred without the plans being on record with the village. He said Complainant was blamed for the missing plans, but they became missing after the termination of Complainant's employment.

Additionally, Witness said he was issued 4 tickets in 4 consecutive days from a Code Inspector who only works two days a week. He said he took a video of her taking pictures of his home, and on February 14, 2018, she wrote him a ticket which was back dated for January 10, 2018. Witness said for the current month (March 2018) 94 tickets were issued, and it seems that certain people were being targeted. The Investigator asked the Village Attorney for a copy of the tickets, which should include the names and addresses for which they were issued.

Witness further noted that at a ZBA meeting in 2016, the building inspector told the Board not to give him a permit to build a basement because "I was just going to build an illegal apartment just like them." Witness said there is tape of the meeting because all the meetings are tape recorded. The Investigator requested a copy of the tape.

Witness was asked if he had heard Complainant being called a "Jew lover." He replied, "No. Not in the office. I was only there to drop off plans."

Witness was asked if he had heard complaints from non-Jewish residents about problems with Village Hall and he replied, "People came to me to complain about Schultz leaving garbage on the property and Jewish people said they feel they are being targeted / harassed." Witness was asked if he had received similar complaints from non-Jewish residents; he replied, "No, but I'm involved with more Jewish people and I talk with

more Jewish people."

Witness was asked if there is anything else he would like to add and he said, "Personally, no matter what I do, it's like constantly throwing darts at me." Witness said he has had multiple stop work orders and his plans have been missing for 7-8 months. [Note: During his interview on 2/28/18, the Building Inspection responded, "No" when asked if a stop work order was issued for Mr. Klein]. Witness detailed that one stop work order was issued by P.J. Corless, the village engineer involving a "disconnect / reconnect" for some electrical work. Witness said the stop work order was during Sukkot, a major Jewish holiday which commemorates the sheltering of the Israelites in the wilderness. The holiday lasts 7 days, which meant a delay in the Witness's availability to respond to the matter. Witness said the request for the 'disconnect / reconnect" was confusing because his electrician informed him it was not required for the type of working being done. Witness said his second stop work order was for a fire sprinkler. When asked asked how the matter was resolved and he replied, "I was told I need to show it on the plan; when I did that, I was told I need a Topo; and it took a month to notify me a stamp was missing, something that could have been done in a day." Witness said he did not further pursue the matter with village hall and opted for litigation after he saw a memo in which Corless noted, "While you can approve it, here are 8 reasons you can deny it."

Witness said on 6/30/17, 5 minutes before the village closed for the Independence Day holiday weekend, he was issued a stop work order. He stated that the stop work order was issued even though he had done any modification to the home; the only thing that was done was that he had a company raise the foundation of the home 4 ½ feet and the company was scheduled to return on 7/5/17 to lower the house. Witness was asked the reason that was indicated on the stop work order and he said, "The plans don't match the house." Witness said he met with the building inspector to express his confusion and to ask for an explanation for the stop work order because he had not started any work on the home and the home was in the same condition it had been since the 1980s. Witness said the building inspector pointed to the walls and said it's the wall. He said he asked the building inspector what were his concerns about the walls because he had not done anything to them. Witness said he informed the representative from the company that had raised the house about the stop work order and he was told that the end of the summer would be earliest date to reschedule the appointment and he would be charged for each day the company's equipment was in use to raise the house.

Witness said on 7/5/17, he observed two village police cars parked in front of his house for 1.5 hours and after the police cars left, Zummo, the

By: rcaquias

Events (32)

Building Inspector, appeared and issued him a
violation, with court date for 7/28/18, for
continuing to work during a stop work order.
Witness said he was surprised by Zummo's
issuance of the violation because Zummo, who
was there a week earlier, told him everything was
fine. He said he asked Zummo what was going
on and Zummo responded, "I feel like a fool. It's
Noreen's fault. She told me the house has many
violations." Witness said Zummo told him to
resubmit the plans. Witness said it was 7/5/17,
the court date was 7/28/17, and the stop work
order noted that work could continue until the
court date; therefore, he had the company lower
the house as scheduled.

Witness further reported that in August 2017, two
inspections were done on his property, the first on
August 4th and the second on August 5th and in
October 2017, he received a stop work order. He
said he was told that the order was issued because
the work he was doing did not match the plan.
However, he did not understand the reason for the
stop work order he had not done any work on the
house. Witness also stated that he was issued a
citation because he authorized someone who was
digging a pool to dump 6 loads of dirt on his
property. Witness said Zummo told him he could
not grade without a permit and a month later he
received a backdated ticket in which he was cited
for grading without a permit. He said that when
told Zummo he was incorrectly ticketed because
he did not grade his property. Zummo responded
by showing him one of the 6 loads over which the
equipment had run over during the renovations.
Witness said he was perplexed because it was
obvious the equipment had run over the pile and
the other 5 piles remained untouched; therefore, it
was clear that he was not grading his property.

Witness was asked whether the Mayor was
involved and he replied, "I don't know. I don't'
know what is at the core, but I don't think Zummo
is doing it by himself. He is not the type to
scheme."

Witness said he wants to see the village residents
united. He said, "Things could be nice; it doesn't
have to be this way." He said, for example,
during the planning for the village's 50th
anniversary, he observed that the everything to eat
was non-kosher. Therefore, he donated 400-500
kosher hot dogs for the event.

Witness was asked if the issues were related to his
being Orthodox and he replied, "It may be
political because I ran with Ian Banks, who the
Mayor hates or it could be Orthodox. I'm into
being fair to everyone." When asked if he
thought the process was fair to everyone, he
responded, "I've heard complaints." He added
that the newly hired Code Enforcement Officer
issued 94 tickets in the past month, (January
2018). He said 4 of the 94 tickets were issued to
him for working through a stop work order. The

Name: Noreen Shea v. Village of Pomona (1)

Events (32)

village attorney explained that the code
enforcement officer issued so many tickets
because the village had not had a code
enforcement officer for about 2 years and "The
Mayor had directed the Building Inspector to go
out, but he did not do it; he said he did not have
the time."

All
Determination Due Date

Wed 5/2/2018
Completed
6/12/2018

MOU Agency
FIRABOD Submitted by Rockland Co HRC

Mon 6/4/2018
Completed
6/12/2018

MOU Agency
Transfer to Regional Office
White Plains
Mon 6/11/2018
Completed
6/12/2018

Regional
Receive file in Region

Tue 6/12/2018
Completed
6/12/2018

Regional
Probable Cause Determination Issued

Tue 6/12/2018
Completed
6/12/2018

Regional
Serve Probable Cause Determination

Tue 6/12/2018
Completed
6/14/2018

 LawManager®

# NYS DHR
## EVENT HISTORY WITH COMMENTS

Name: Noreen Shea v Village of Pomona (1)

**Events (32)**

| | |
|---|---|
| | EEOC Contracts |
| | Determination/Closing Notification (ECU) |
| | |
| Date | Tue 6/12/2018 |
| Status | Pending |
| Date Completed | |
| Comments | |

| | |
|---|---|
| | Regional |
| Type | Transfer - Probable Cause |
| | |
| Date | Thu 6/14/2018 |
| Status | Pending |
| Date Completed | |
| Comments | |

| | |
|---|---|
| | All |
| Type | Commissioner's Order Due Date |
| | |
| Date | Fri 1/18/2019 |
| Status | Cancelled |
| Date Completed | |
| Comments | |

Report complete. Number of main records listed: 1