**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TAL PROPERTIES OF POMONA, LLC and AVROHOM MANES,<br><br>*Plaintiffs,*<br><br>-*against*-<br><br>VILLAGE OF POMONA, BRETT YAGEL, individually and in his official capacity as Mayor of the Village of Pomona, and DORIS ULMAN, individually and in her official capacity as Attorney for the Village of Pomona,<br><br>*Defendants.* | **Case No. 17-cv-02928 (CS)**<br><br>**[PROPOSED]**<br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs TAL Properties of Pomona, LLC ("TAL Properties") and Avrohom Manes ("Manes"), by and through their counsel, Schlam Stone & Dolan LLP, for their Third Amended Complaint against Defendants the Village of Pomona (the "Village"), Brett Yagel ("Yagel" or the "Mayor"), and Doris Ulman ("Ulman"), allege as against defendants as follows:

## NATURE OF THE ACTION

1.      This action seeks to hold accountable a village government thoroughly rotted with bigotry.  The deeply disturbing facts alleged herein were uncovered in a whistleblower complaint to the New York Division of Human Rights and a months-long investigation by counsel.

2.      The Mayor, the Village Attorney and other leaders in the Village of Pomona, Rockland County, have orchestrated a campaign of harassment and exclusion against Orthodox Jewish residents.  Defendants have turned Pomona's local government against a discrete religious minority, weaponizing local code enforcement and zoning laws to target Orthodox Jews for disparate treatment, while conspiring to deny basic municipal services to them.  Defendants' thinly-veiled agenda is clear:  to make life intolerable for current Orthodox residents of Pomona,

and in the long term, to deter more of "them" or "those people" (as the Mayor derisively refers to Orthodox Jews) from moving to the community.

3.       Plaintiff Avrohom Manes is one of the many victims of Defendants' animus against Pomona's Jewish community.  Mr. Manes is an Orthodox Jew and resident of Pomona. He also owns investment properties in the Village through his wholly-owned company, Plaintiff TAL Properties.

4.       In late 2015, Mr. Manes purchased a residential home at 22 High Mountain Road in Pomona (the "22 High Mountain Property"), as well as other subdivided but undeveloped properties (the "Subdivided Properties").   Over the next year, Defendants engaged in a concerted effort to harass Mr. Manes with the goal of preventing him from potentially selling to and attracting additional Orthodox Jewish residents to the Village.

5.       For example, at the direction of Defendants Yagel and Ulman, the Building Inspector, Louis Zummo, delayed for months in issuing a certificate of occupancy for the 22 High Mountain Property – even though he had confirmed in early 2016 that Plaintiffs had completed all necessary repairs and were in compliance with applicable building codes, and promised at that time that a certificate of occupancy would be issued promptly.  To justify their actions, Defendants Yagel and Ulman claimed falsely that Plaintiffs were responsible for a $6,000 debt that was supposedly owed to the Village by a prior owner of the 22 High Mountain Property.  Defendants had no right to do this, since among other things they never recorded this supposed debt as a lien against the 22 High Mountain Property prior to Plaintiffs' purchase. Tellingly, Defendants never made any effort to collect the debt from the prior (non-Jewish) owner, even permitting a bond he had posted to lapse without collection, though he had failed to complete a construction project secured by the bond.  Defendants were looking for any excuse to

2

deny a certificate of occupancy to Plaintiffs.  It was later discovered that the supposed "bill" was a fabrication.

6.      Additionally, Defendants withheld a grading permit from Plaintiffs that would have permitted them to create useable backyard space out of steep slopes on the 22 High Mountain Property, thus enhancing its value.  Plaintiffs spent time and money developing a grading plan in conjunction with the Village engineer, but Defendants Yagel and Ulman pressured the engineer to retract his approval of the plan, and to insist that Plaintiffs comply with costly prerequisites that were never imposed on other similarly-situated owners – requiring, among other things, that Plaintiffs post a bond for possible damage to neighboring property and conduct unusually complex and expensive tests of the compressed fill they used for grading. And even after Plaintiffs agreed to these conditions, Defendants still denied them the grading permit.

7.      Moreover, the Village has prevented Mr. Manes from building on the other Subdivided Properties he purchased in the Village by making a frivolous claim that the roads accessing those properties are private roads (and thus Mr. Manes' obligation to maintain). Although the roads at issue are clearly public roads, Defendants have seized on their false claim as an excuse to deny Mr. Manes the permits necessary to develop the Subdivided Properties (lest the properties attract or be sold to additional Orthodox Jewish residents to the Village).  This has made it impossible for Mr. Manes to exercise his property rights by improving or selling the Subdivided Properties.  In addition, Defendants have made a frivolous claim that Mr. Manes owes money for a bill they claim to have paid for snow removal on the access roads.  Not only is there no basis to make Plaintiffs pay for the cost of maintaining the roads, but the snow removal bill is a complete fabrication.  The Village has a contract with Town of Haverstraw for snow

removal services on public roads.  However, there is no portion of the bill that is itemized for the access roads for which the Village is now claiming Plaintiffs are responsible.

8.      Still more instances of Defendants' discriminatory treatment of Plaintiffs are set forth below.

9.      A bombshell report by an investigator from the New York State Division of Human Rights, issued in June 2018, reveals that Defendants mistreatment of Mr. Manes is not an isolated incident, but rather part of a concerted "agenda against Jewish residents" of Pomona. Plaintiffs are among the many victims of Defendants' illicit agenda.  In this action, Plaintiffs seek damages for the discriminatory treatment they suffered, as well as injunctive relief to prevent further such misconduct, and ultimately to ensure that Defendants respect the fundamental constitutional right of equal treatment under the law for all residents of Pomona.

10.      Founded in 1967, Pomona is a small village in Rockland County with a growing population.  Over the past decade, and more so in the last five years, Hasidic and other Orthodox Jews have moved to Pomona from neighboring communities.  Defendant Yagel was elected a Village trustee in 2007 on a platform of opposing the establishment of an Orthodox rabbinical college in Pomona.  He served as Mayor from 2011 until he stepped down in 2019.

11.      The Village, acting at the direction of Yagel and Leon Harris, the Deputy Mayor, and with the assistance of Building Inspector Zummo, and Village attorney Doris Ulman, actively sought to prevent the increase of Jewish residents.

12.      Defendants have employed a range of discriminatory techniques to achieve their unlawful agenda – 1) enacting unconstitutional new zoning laws and practices; 2) pretextual delays and denials of permits and certificates of occupancy to Jewish homeowners and developers; 3) harassing real estate brokers (and their customers) known for selling to Orthodox

4

clients; 4) targeting Jewish-owned residences for selective enforcement of code violations – for example, executing pre-dawn Saturday morning ticketing blitzes (referred to by Yagel as "shul patrols"); and 5) accepting and encouraging deranged and blatantly anti-semitic "complaints" from non-Jewish residents as legitimate justifications for intrusive inspections and harassment (*e.g.*, complaints referring to Orthodox Jews as "Corporation members" and prayer groups as business meetings and "the people living on the hill").

13.      For several years, Mr. Manes and other Orthodox residents have observed anecdotal examples of such unfair treatment of Orthodox Jews by the Village authorities.  For example, Orthodox Jewish residents have been subjected to discriminatory ticketing for minor and often odd alleged code violations – relating to issues such as dog waste (without owning a dog); leaf disposal tickets (with far worse violators on the same block left unticketed); and a ticket for a Toys 'R' Us pool – when similarly-situated non-Jewish residents have not been ticketed for the same infractions.

14.      Indeed, before the influx of Orthodox Jewish residents, Pomona did not engage in routine enforcement of minor code issues at all.  But as the Jewish community has grown, the Village enlisted Building Inspector Zummo – and later deputized a special code enforcer – to target and harass Orthodox Jewish residents with discriminatory ticketing.

15.      Recent revelations have confirmed that Plaintiffs' experiences are not one-off incidents of unfair treatment, but part and parcel of Defendants' deliberate agenda of discrimination against Orthodox Jews.  Facts uncovered in the Division of Human Rights investigation sparked by the whistleblower complaint of a former Village employee, have laid bare the discriminatory animus underlying Defendants' mistreatment of Plaintiffs and other Orthodox Jewish residents.

16.     The Human Rights Report is the result of a whistleblower complaint filed by Noreen Shea, a non-Jewish former Deputy Clerk in the office of the Village Clerk, who objected to the discriminatory treatment of Orthodox Jewish residents – and was fired for that reason.

17.     Ms. Shea revealed to the Human Rights Division what she described as Defendants' "hidden agenda against [] Jewish residents," stating in stark terms: "***If anyone dares tell me there is no religious discrimination in the Village of Pomona, they have not worked a day in the building department***."

18.     Some of the more troubling examples of discriminatory animus described by Ms. Shea in the Human Rights Report – and the testimony of other victims and municipal officials who were prompted to come forward by her whistle-blowing – include the following:

- Mayor Yagel routinely referring to Orthodox Jews in the Village office with open hostility as "***Them***" or "***Those People***."

- Mayor Yagel directing his animus against Orthodox Jews to Mr. Manes in particular by chastising Ms. Shea for talking with Mr. Manes, and instructing her that she should have "very little conversation with '***those types***.'"

- Mayor Yagel confronting a long-time Village resident who had sold her home, and demanding to know if she had sold the property to one of "***Them.***"

- Mayor Yagel suggesting that Ms. Shea place pork rinds on the public counter of the village clerk's office to deter the growing Orthodox Jewish population from seeking access to municipal services.

- The Village building inspector, Louis Zummo, ***admitting*** to the Human Rights Division that he mocked Orthodox Jewish residents, in the course of performing his official duties, through "comical" imitations of their manner of talking, while disparaging them as "carrying on" when they were denied services.

- Building Inspector Zummo advising the Village zoning board not to issue a construction permit to an Orthodox Jewish resident, Robert Klein, to build a basement because it would be "just like them" to then use it as an illegal apartment.

- Building Inspector Zummo refusing to issue a permit requested by an Orthodox Jewish family to accommodate his two severely disabled children – and commenting: "maybe he should stop having children".

- Orthodox Jewish residents facing arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to by a non-Jewish village trustee, Ian Banks, who spoke to the Human Rights Division investigators.

- Village Attorney Doris Ulman admitting to Mr. Manes and his attorney in another action that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village," and attempting to justify her involvement with the excuse that, "it's my job to represent Mayor Yagel," when in fact she represents the Village, including its Jewish residents.

- The Village government "target[ing] the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and prayer gatherings.

19.    Ms. Shea alleges that her refusal to participate in such discriminatory treatment of Orthodox Jewish residents led Defendant Yagel to retaliate against her.  In a shocking example, Ms. Shea alleges that Mayor Yagel referred to her as a "***Jew Lover***" – an accusation that was reported to Trustee Banks at the time (Mr. Banks confirmed that Ms. Shea contemporaneously reported this slur to him prior to her termination).  Ms. Shea also reported that there was an "an overall attitude in the Village of Government to be unresponsive to requests from Orthodox Jewish residents for access to property records."  Ms. Shea was ultimately terminated when she refused to heed Yagel's instructions to "stop being too cooperative with Jewish residents."

20.    The Human Rights Division found "probable cause to support" Ms. Shea's allegations and took the unusual step of ordering the matter to proceed to a public hearing before an administrative law judge.  Ms. Shea elected instead to pursue her claims in this Court.

21.    Plaintiffs respectfully ask this Court to put an end to Defendants' discriminatory practices once and for all and to restore the rule of law to the Village of Pomona.

## THE PARTIES

22.     Plaintiff TAL Properties is a limited liability company formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district.

23.     Plaintiff Avrohom Manes is the sole owner of TAL Properties and is an Orthodox Jew and resides in the County of Rockland.  He is also an investor in real estate.

24.     Defendant Village of Pomona is a municipal corporation formed pursuant to the laws of the State of New York and conducting business in the County of Rockland, within this judicial district.

25.     Until April 1, 2019, Defendant Brett Yagel was the duly elected Mayor of the Village and, as and for the matters alleged herein, he the final policy maker for defendant Village. He is sued both in his official and individual capacities.

26.     At all relevant times, defendant Doris Ulman is and has been the duly appointed Village Attorney.  She is sued in her official and individual capacities.  In another lawsuit in this Court, Judge Karas found that Ulman authored local ordinances that were intended to discriminate against Orthodox Jews by preventing a rabbinical seminary from entering the community.

27.     The complained of acts by defendants Yagel and Ulman were undertaken under color of state law.

## JURISDICTION AND VENUE

28.     As Plaintiffs allege that Defendants discriminated against them based on religion in violation of the First and Fourteenth Amendments to the United States Constitution, this

Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1331 & 1343(3) & (4) and 42 U.S.C. secs. 1983 and 1988.

29.     In addition, this Court has supplemental jurisdiction, under 28 U.S.C. § 1367(a), over Plaintiffs' state law claims.

30.     Venue is proper in this district under 28 U.S.C. § 1391(b) in that all claims arose in this district.

## THE FACTS

### A.     Pomona's Hostility to a Growing Orthodox Jewish Population

31.     Pomona is a small village nestled next to the Cheesecote Mountain in a bucolic section of Rockland County.  Founded in 1967, the Village, which is located partly in the town of Ramapo and partly in the town of Haverstraw, occupies a total of approximately 2.4 square miles and has an estimated population of 3,235.

32.     Over the past decade, and increasingly in the last five years, Hasidic and other visibly Orthodox Jews have begun moving into Pomona.  Their arrival has been met with hostility by the Village government.  Defendant Yagel was elected a Village trustee in 2007 on an explicit platform of preventing a rabbinical college from building a seminary with housing for Orthodox rabbinical students and their families in the Village.  In the run-up to the election, Yagel co-authored a letter to a local newspaper, lamenting the arrival in the Village of what he called "homogenous individuals" (i.e., Orthodox Jews), a development that Yagel protested was not a "natural" progression for the Village.  At around the same time, Yagel was quoted in the *New York Times* calling the rabbinical college "disgusting."  Another candidate, who ran on the same ticket as Yagel, warned in a campaign video that the seminary threatened to change "the make-up of the village."

33.     Although they employed code words, such as "homogeneous individuals" and "the make-up of the village," the harsh reality is that Yagel and his associates simply did not want to see Orthodox Jews moving to Pomona.  Judge Karas reached this conclusion in a lawsuit challenging local ordinances the Village passed to prevent the rabbinical college from coming to Pomona.  In a decision issued on December 7, 2017, Judge Karas found that in enacting the laws the Village was motivated by an illicit agenda to prevent the growth of Pomona's Orthodox Jewish community.  Specifically, Judge Karas held: "There is no escaping the fact that . . . Defendants passed the Challenged Laws to thwart the spread of the Orthodox/Hasidic Jewish community into the Village."

34.     Both Defendants Yagel and Ulman were implicated in Judge Karas' decision. Yagel was a named defendant in the lawsuit and both Yagel and Ulman were trial witnesses. Judge Karas observed that he did not credit Yagel's testimony because of his discriminatory comments.  Judge Karas similarly held that he "credits very little of Ulman's testimony about what motivated the adoption of the laws," since "Plaintiffs have proven that their intended purpose was to thwart the development of the rabbinical college because it was proposed by Orthodox/Hasidic Jews."

35.     After serving on the board of trustees for four years, Yagel was elected Mayor of Pomona in 2011.  Despite the damning findings by a federal judge, the same individuals that expressly violated civil rights of Orthodox residents remained in their respective positions in Pomona for years.  Yagel ultimately stepped down as Mayor in April 2019, although Ulman remains the Village Attorney.

36.     Over the course of Yagel's tenure in office, he treated the growing number of Orthodox Jewish residents with hostility.

37.     Consistent with the tone of his original campaign for Village Trustee, Yagel responded to this demographic development by using the local government to target current Orthodox Jewish residents for harassment, and taking steps to deter Orthodox Jews from moving to Pomona – including by discouraging current residents from selling property to them.

38.     At the direction of Yagel and Ulman, the Village has habitually denied permits and certificates of occupancy to current Jewish residents, such as Plaintiff Manes to prevent him from creating new housing on previously-subdivided property that could attract additional Jewish residents to the Village.

39.     Defendants have also harassed real estate brokers known for selling to Orthodox clients, by ticketing them for supposedly placing for sale signs too close to the road, although non-Jewish brokers were not similarly ticketed.  In an email obtained by the Human Rights Division, Yagel himself directed the code enforcer to ticket the Orthodox Jewish brokers.

40.     Defendants have also targeted Jewish owned residences and synagogues for selective enforcement of code violations.  Code enforcement did not exist at all in Pomona until Orthodox Jews began arriving in the Village – Yagel wielded the power to issue code violations to harass Jewish residents.

41.     Pomona has also used building ordinances as a means of discouraging current residents from selling their properties to Orthodox Jews.  In most municipalities, when a title company or prospective seller inquiries about outstanding violations on a property, there is no physical inspection, merely a review of records to determine if there is an outstanding violation.

42.     As Orthodox Jews began moving into Pomona, Defendants introduced an onerous policy – without passing any authorizing law or ordinance – that makes it more difficult to sell property or to assess whether closing will be possible.  Under the new policy, internal

inspections of each home for code violations are required as a matter of course in almost any property sale, adding another roadblock to selling properties to the Orthodox Jewish buyers.

43.     The message this sends is clear:  if long term residents have illegal basements or renovations, they are overlooked.  However, as soon as they attempt to sell their property they will be subjected to an invasive and potentially costly code enforcement process – a significant roadblock to efficiently selling a property, and in particular to selling to a group that Mayor Yagel has made perfectly clear is disfavored by the local authorities.

44.     Indeed, email correspondence uncovered by the Human Rights Division shows that one long-time, non-Orthodox resident was given a pass and allowed to continue using her illegally-renovated basement, so long as she does not "sell the property."  (At the same time, an Orthodox Jewish resident, Robert Klein, was denied permission to build a basement because it would purportedly be "just like them" to use it as an "illegal apartment".)

45.     The individual acts of discrimination might have seemed unrelated until a whistle-blower came forward and exposed Defendants' intentional discriminatory scheme.

**B.      Whistle Blower Noreen Shea Exposes a Widespread "Hidden Agenda Against Jewish Residents" of Pomona**

46.     In June 2018, the New York State Division of Human Rights issued a report, following an investigation of alleged discrimination against Orthodox Jewish residents by the Village government.  The non-public investigation was sparked by a whistleblower complaint filed by Noreen Shea, a former non-Jewish employee in the Village Clerk's office, who alleges that she was terminated because she was unwilling to be complicit in "an ongoing hidden agenda against [] Jewish residents" of Pomona.  Ms. Shea's revelations – and other evidence uncovered by the Human Rights investigator – paints a disturbing picture of a local government targeting a segment of its residents for mistreatment on the basis for their religious identity.

47.     The revelations from the Human Rights Report (including documents obtained by the investigator), as well as witnesses that have come forward as a result, are summarized below.

48.     **"Us vs. Them" Culture.**  Ms. Shea described an "Us vs. Them" culture cultivated by Mayor Yagel in the Village offices with respect to Orthodox Jewish residents. According to Ms. Shea, Mayor Yagel routinely referred to Orthodox Jews with contempt as "Them" or "Those People."  Ms. Shea explained that Yagel's animus against Orthodox Jews was directed to Mr. Manes in particular.   In one instance, he chastised Ms. Shea from being pleasant to Mr. Manes, warning her she was to have "very little conversation with '*those types*.'"

49.     In another instance, he berated a long-standing resident who had sold her home through a broker known for working with Orthodox Jews, demanding to know whether she had sold the property to one of "Them."  At the same time, according to emails obtained by the investigator, Yagel went out of his way to help a potential resident (with a non-Jewish sounding surname) locate an acceptable rental property.

50.     In another troubling incident, Mayor Yagel suggested that pork rinds be placed on the public counter of the Clerk's office to deter Orthodox Jews who come in the office seeking municipal services.

51.     Mayor Yagel criticized Ms. Shea for responding too quickly to FOIL requests from Orthodox Jewish residents, instructing her that they should be made to wait until the last day of the deadline even when records were readily available – although Yagel told her to provide records immediately to a non-Jewish man who came to the office.

52.     The open hostility to Orthodox Jews was not limited to Mayor Yagel.  Building Inspector Louis Zummo admitted to the Human Rights Division that he openly mocked

Orthodox Jews complaining about the denial of municipal services through Jackie Mason-style "impersonations" of Orthodox Jewish residents "carrying on."

53.     Because she did not want to participate in the unequal treatment of the Village's Orthodox Jewish residents, the Mayor referred to Ms. Shea as a "***Jew Lover***."  A non-Jewish Village Trustee, Ian Banks confirmed to the Human Rights Division investigator that, prior to her termination, Ms. Shea had reported the use of the terms "***Jew Lover***" (to refer to her) and "***Those People***" (to refer to Orthodox Jews).

54.     **Zoning and Construction Permit Issues.**  The Human Rights Report reveals that the Village abused its authority by withholding certificates of occupancy and construction permits as part of a broader effort to discriminate against Orthodox Jewish residents.

55.     The Human Rights Division investigator reports testimony that other Orthodox Jewish residents faced arbitrary and unjustified delays in the issuance of building permits and certificates of occupancy – a fact attested to not only by Ms. Shea but also by a non-Jewish village trustee, Ian Banks.

56.     Ms. Shea described how Zummo refused to issue a permit requested by an Orthodox Jewish family to accommodate the needs of two severely disabled children.  Upon information and belief, before this resident moved to the Village, Zummo had informally approved the changes he planned to make.  However, Zummo refused to issue the necessary permit, and was overheard by Ms. Shea saying, "maybe he should stop having children".  In another incident, Zummo advised the Village zoning board not to allow an Orthodox Jewish resident to renovate his basement because it would be "just like them" to then use the basement as an illegal apartment.

57.     Ulman herself told Mr. Manes that she ultimately resigned from representing the Village zoning board because it was discriminating against Orthodox Jewish residents.  Upon information and belief, this was after Ms. Ulman learned that counsel for Plaintiffs was conducting an investigation regarding discrimination in the Village and that residents of the Village had obtained the files of the Division of Human Rights investigation.

58.     **Code Enforcement and Selective Ticketing.**  The Human Rights Report also reflects evidence that Defendants improperly "targeted the Jewish community for disparate treatment" through "selective ticketing of Jewish residences" and synagogues.  The Human Rights Report notes that the investigator reviewed emails from Defendant Yagel to building inspector Zummo ordering him to issue violations.  In addition, when interviewed by the Human Rights investigator, Building Inspector Zummo admitted that Defendant Yagel directed him to perform garbage inspections "on the weekend."

59.     One Orthodox Jewish resident received a ticket for a garbage/recycling violation at 4:25 am on the Sabbath, which was part of a pre-dawn ticketing blitz, ordered by Mayor Yagel, targeting Jewish residents.

60.     The Village at the time did not have a dedicated code enforcer.  Yagel directed Building Inspector Zummo to target the Jewish community referring to the overnight enforcement as "shul patrols".

61.     In addition, upon information and belief, Yagel assumed that since Orthodox Jews do not drive after sunset on Fridays, there would be Jewish cars parked overnight in violation of the overnight parking ordinances in Pomona.

62.     Upon information and belief, based on Zummo's discussions with residents at the time, the only cars violating the parking ordinance belonged to Village officials and their friends.

Undeterred, Zummo then issued garbage violations to a number of Jewish residents living next to shuls (synagogues).  Upon information and belief, Pomona has not engaged in any overnight enforcement activities in general or against other groups.

63.     Mayor Yagel has also directed Village personnel to call the police to complain about Jewish residents walking home from synagogue on the Sabbath – falsely claiming that these residents walking on the side of the street is somehow blocking traffic.

64.     Orthodox Jewish residents have also been subjected to discriminatory ticketing for minor and often odd alleged code violations – relating to issues such as dog waste (without owning a dog); leaf disposal tickets (with far worse violators on the same block who were not ticketed at all); and a ticket for a small pool purchased at Toys 'R' Us.

65.     Upon information and belief, two former Village employees (Zummo's predecessor and a separate code enforcer) resigned their positions because they were unwilling to heed Yagel's directives to selectively target members of the Orthodox Jewish community.

**C.     Plaintiffs' Fall Victim to Defendants' "Hidden Agenda Against Jewish Residents"**

66.     Plaintiffs have fallen victim to the discriminatory "agenda against Jewish residents" of the Village that was exposed by the Human Rights Report.

67.     In December 2015, Mr. Manes purchased a residential home at 22 High Mountain Road within the Village of Pomona (as noted, the "22 High Mountain Property").

68.     Plaintiffs also purchased other subdivided but undeveloped properties in the same area.  At the time of purchase, these properties were subdivided and approved by the Village for residential use – something that occurred years before Mr. Manes' purchase.  Nevertheless, the Village denied permits and certificates of occupancy with respect to these properties to prevent Manes from creating new housing that could attract additional Jewish residents to the Village,

unless Plaintiffs agreed to maintain the roads as private roads, even though the roads are and have always been treated as Village roads.

1.     **The 22 High Mountain Property**

69.     In January 2016, Plaintiffs made repairs to the 22 High Mountain Property.

70.     In January 2016, Building Inspector Zummo inspected the 22 High Mountain Property on behalf of the Village.

71.     Zummo concluded and advised Plaintiffs that they had completed the referenced repairs in accordance with applicable building codes and other applicable regulations and that a certificate of occupancy should issue.

72.     During his interactions with Zummo, Mr. Manes met defendants Yagel and Ulman, both of whom knew he was Jewish.

73.     Despite Plaintiffs qualifying for the issuance of a certificate of occupancy, defendants Yagel and Ulman directed Zummo not to issue the certificate of occupancy.

74.     In so acting, defendants Yagel and Ulman made municipal policy with regard to the circumstances disallowing the issuance of such permits.

75.     Defendants' direction contravened the Village's Construction Code [chapter 47-10], which required issuance of a certificate of occupancy where, as here, the applicant complied with applicable code requirements.

76.     In seeking to justify the Village's refusal to issue the Certificate of Occupancy, defendant Yagel, acting by and through defendant Ulman, claimed that a prior owner of the property owed the Village $6,379.34 and demanded payment of that sum from Plaintiffs in exchange for the issuance of a Certificate of Occupancy.

77.     At no time did Defendants claim that Plaintiffs had incurred this debt, nor was there a basis for any such claim.

78.     Village law and the Village code do not permit denial of a certificate of occupancy because a prior property owner failed to satisfy a debt the Village failed to record as a lien against the 22 High Mountain Property by the time Plaintiffs purchased the same or at any time preceding its assertion of this as the basis for denial of a certificate of occupancy. This is particularly true where, as here, Plaintiffs purchased the 22 High Mountain Property at a foreclosure sale.

79.     Indeed, out of animus for Mr. Manes' religious faith, Defendants Yagel and Ulman dictated this result to delay, block and prevent Plaintiffs from potentially attracting additional Orthodox Jewish residents to the Village and gaining benefit from their purchase of the 22 High Mountain Property.

80.     By comparison, defendants Yagel and Ulman failed to take any action to collect the sum of $6,379.34 from the home's prior owner, who was not Jewish, and, on behalf of the Village, permitted that same developer's bond to lapse without collection though the developer failed to develop and complete projects secured by the bond.

81.     Through calendar year 2016, defendants Yagel, Ulman and the Village imposed other disparate and discriminatory conditions upon Plaintiffs as they sought to sell the 22 High Mountain Property, repeatedly concocting and then using false explanations for delays in the issuance of Certificate of Occupancy without which Plaintiffs could not alienate their property.

82.     In the summer of 2016, again at defendant Yagel's direction and contrary to the treatment afforded similarly-sloped and neighboring properties on High Mountain Road owned by non-Jews, the Village required Plaintiffs to fulfill costly conditions before being permitted to

grade out steep slopes on the 22 High Mountain Property, and thereby create useable backyard space, enhancing the value of the 22 High Mountain Property.

83.    When Plaintiffs submitted the grading plan, the Village engineer initially approved it.

84.    However, under pressure from defendants Yagel and Ulman, the Village engineer retracted his approval and imposed costly conditions upon Plaintiffs.

85.    Specifically, Plaintiffs' engineer and the Village engineer (Joseph Corless), together developed the first set of plans to address the steep slopes.

86.    Defendants Yagel and Ulman then intervened and directed Corless to disavow the plan he had helped develop.

87.    Building Inspector Zummo acknowledged that Corless was reneging on his prior approval.  Yet the Village continued to insist that Plaintiffs complete costly requirements which other similarly-situated and non-Jewish property owners did not have to satisfy, further delaying Plaintiffs' alienation of their property and reducing its market value.

88.    Specifically, Defendants required Plaintiffs to post a bond to insure that they did not damage their neighbor's property; such a requirement was highly unusual in the Village in like circumstances and, upon information and belief, was not imposed on non-Jews.

89.    In addition, Defendants required Plaintiffs to show that the original land surveyor whose work product Plaintiffs used in their submission had authorized such use; this, too, was highly unusual as such land surveys are typically relied upon without such authorization, and, upon information and belief, no non-Jews were required to make a such a showing.

90.     In additions, Defendants required Plaintiffs to test the compressed fill they used for grading in a manner inconsistent with requirements imposed on others using such fill for similar projects on property owned by non-Jews.

91.     After Plaintiffs agreed to comply with these unusual and costly requirements imposed by Defendants, the Village still rejected their application and did not issue a permit for the grading work.

92.     Due to the incomplete nature of this work, Plaintiffs were unable to sell the 22 High Mountain Property for the price expected or recoup the profit anticipated from the 22 High Mountain Property.

93.     Zummo and the Village Clerk, Ms. Shea, have both expressly told Manes that defendants Yagel and Ulman advised them to give Plaintiffs a hard time with anything they needed.

94.     The Village engineer's selective requirements explained above, as dictated by defendants Yagel and Ulman, caused a substantial delay in the sale of Plaintiffs' 22 High Mountain Property and a significant decline in the sales price.

95.     In the late fall 2016, plaintiffs entered into a contract for the 22 High Mountain Property's sale.

96.     By this time, further demonstrating the baselessness of this claim which had delayed Plaintiffs for months, defendant Village dropped any claim that Plaintiffs owed fees incurred by the prior property owner and gave Plaintiffs a certificate of occupancy without payment of this alleged debt.

97.     Following sale of the 22 High Mountain Property, the Village of Pomona threatened to withdraw the certificate of occupancy if Plaintiffs failed to sign an agreement

acknowledging, *inter alia*, that the road accessing the 22 High Mountain Property was not a village road and that its maintenance was the sole responsibility of the property owner.

98.     There was no basis to requiring the signing of this agreement.  This was simply another effort by Defendants to impede and complicate Plaintiffs' alienation of the 22 High Mountain Property.

99.     The delays in issuing the required certificate of occupancy and the discriminatory imposition of onerous grading requirements caused Plaintiffs to incur a substantial decline in the sales price for the 22 High Mountain Property.

100.    But for these delays, the Plaintiffs would have been able to sell the 22 High Mountain Property in early 2016 and use the proceeds so realized for other profitable business opportunities.

## 2.     The Subdivided Properties

101.    In addition to the 22 High Mountain Property, Defendants have prevented Mr. Manes from building on the other Subdivided Properties he purchased in the Village by making a frivolous claim that the roads accessing those properties are private roads (and thus Mr. Manes' obligation to maintain).  The Subdivided Properties had been approved for development by the Village long ago and there was never any claim that the roads leading to them were private or that the owner of the Subdivided Properties would be responsible for repairing and maintaining them.  Indeed, the roads at issue are clearly public roads, and have always been treated as such, but Defendants, due to their animus against Orthodox Jews and based on their concern that the Subdivided Properties could be sold to and would attract additional Orthodox Jews to the Village, have seized on their false claim as an excuse to deny Mr. Manes the permits necessary

to develop the Subdivided Properties, making it impossible for him to realize a return on his investment.

102.     As an example of just one aspect of this discrimination, the Village has made a frivolous claim that Manes owes money for a bill they claim to have paid for snow removal on the access roads leading to Subdivided Properties.  Leaving aside the fact that there is no basis to make Plaintiffs pay for the cost of maintaining these roads, which are and always have been treated as Village roads, the snow removal bill is a complete fabrication.  The Village has a contract with Town of Haverstraw for snow removal services on public roads.  However, there is no portion of the bill that is itemized for the access roads for which the Village is now claiming Plaintiffs are responsible.

### 3.     Defendants' Additional Acts of Discrimination Against Plaintiffs

104.     Plaintiffs have suffered other acts of discrimination at the hands of Defendants.

105.     *First*, in mid-December 2017, the Village Building Inspector Louis Zummo issued a baseless stop work order for a project on the driveway at Manes' home.  A permit had been issued for the project, and no work was being performed when Zummo came to deliver the order, which had already been filled out at the Mayor's request in the Village Office before Zummo even came to the site.  Zummo told Manes that Mayor Yagel directed him to issue the order at the behest of a non-Jewish neighbor of Manes, who is Yagel's friend.

106.     Ironically, the Village refused to take any action when that same neighbor constructed two large pillars with his name and address on the at the entrance to a road that leads to his and Plaintiff's homes and a third neighbor's home.  Zummo admitted that the Village code did not permit the neighbor to place the pillars there, and that no permit had been issued for this.

However, at Mayor Yagel's instruction, Zummo stood by and allowed this, and did not issue a violation.

107.   **Second**, the Village has refused to issue a property tax refund to Manes, even after it received Court orders directing it to reduce the assessment.  In defiance of these orders, the Village has to date refused to issue the refund.

108.   **Third**, Defendant Ulman admitted to Manes, in the last year, that she urged a local land owner, who at the time was in serious negotiations with Manes to sell various parcels in the Village, not to sell to Manes, and rather to sell the property to another buyer who is not an Orthodox Jew. As a result of Ulman's interference, the owner backed out of the transaction and refused to sell to Manes, thus causing Manes to lose out on a transaction worth millions of dollars.

109.   **Fourth**, Defendants discriminated against Plaintiffs in failing to provide documents in response to Manes' requests for access to public land and building records under New York's FOIL statute.  Prior to this Court's entry of the Order dismissing his Complaint for failure to state a claim, Manes made numerous attempts to obtain records from the Village regarding similarly-sloped properties that would serve as comparators in support of his selective enforcement claim, including the properties located at 6, 8 and 10 High Mountain and 2 Riverview Court.  However, he was either told there was "no file", or the relevant documentation was missing from the file.

110.   The Human Rights Report shows that Plaintiffs' inability to obtain evidence of comparators was not a coincidence but the result of Defendants' deliberate misconduct. The Human Rights Division investigator heard testimony from Ms. Shea and Village Trustee Ian Banks that the "building files were in disarray"; that Ms. Shea complained of an inability to

access records and a lack of training in how to do so; and that two memorandums Ms. Shea sent

to the Trustees reporting on these issues went unheeded.  Even worse, Ms. Shea reported that she

was chastised for being "too cooperative" with Orthodox Jewish residents in responding to their

record requests, and that she was instructed to "make them wait" for a response even if it could

be provided expeditiously.  Further, as noted, Ms. Shea describes "an overall attitude in the

Village of Government to be unresponsive to requests from Orthodox Jewish residents for access

to property records" – although, when a non-Jewish person came to the Village office to make a

FOIL request, Mayor Yagel instructed her to provide the records immediately.

111.    Moreover, Ms. Shea explained that only files located on the ground floor of the

Village office were served in response to FOIL requests – other records stored in the basement

were not searched.

112.    Building Inspector Zummo has likewise admitted to Mr. Manes that the Village

files were in disarray and that files stored in the basement of the Village Office were not

searched in response to FOIL requests. In particular, he admitted that relevant documents on the

22 High Mountain Property (i.e., the documents relating to the slope) were missing.  And he

acknowledged that the files necessary to show comparators elsewhere on the street or nearby

streets were either missing entirely, or the relevant portion was missing.

## C.    Other Orthodox Jewish Residents, Who Were Subjected to Similar Mistreated Have Filed Suit in This Court

113.    In November 2018, three other Orthodox Jewish residents of Pomona, Robert

Klein, Samuel Indig and Meir Kahana, filed suit in this Court alleging similar acts of intentional

discrimination, *Indig v. Pomona*, Case No. 7:18-cv-10204-VB.

114.    In particular, Mr. Indig was improperly denied permission to complete grading work on his backyard that the building inspector initially approved, leaving him with an unsafe slope that makes his yard unusable by his family.

115.    Mr. Klein was denied construction permits and subjected to serial stop work orders that have prevented him for years from completing renovations to his house, and also faced discriminatory ticketing for supposed leaf disposal violations, when non-Jewish neighbors were not similarly ticketed.  In addition, after Mr. Klein was elected to the Village board of trustees, he was treated as a second-class member.  Yagel denied him a key to the Village offices that other non-Jewish board members have, and withheld records from him that are necessary to perform his duties.  The Village also refused to update its website to include Mr. Klein in the list of trustees.

116.    Finally, Mr. Kahana was targeted by Defendants for discriminatory code enforcement, including a ticket he received for a Toys 'R' Us pool he temporarily placed in his yard and a warning notice for dog waste, though he has no dog.

## D.    **Defendants and Other Village Personnel Have Admitted That The Treatment of Plaintiffs Is Due to Mr. Manes' Religion**

### 1.    **Admissions by Building Inspector Zummo**

118.    Following the issuance of the Human Rights Report, Manes had several conversations with Building Inspector Zummo (some of which are recorded), during which Zummo admitted that Defendants discriminated against Plaintiffs on the basis of Manes' religion.

119.    Specifically, Zummo admitted that Yagel and Ulman intentionally caused delays in the issuance of a certificate of occupancy for the property Plaintiffs owned at 22 High Mountain Road by imposing requirements that were not applied to other non-Jewish property

owners.  He admitted that Ulman caused the property file for the 22 High Mountain Property to be altered in an effort to substantiate the claim, as discussed above, that there was a $6,000 bill for work associated with the property.  Zummo reviewed the file and found no evidence of such a bill, and learned that, at the direction of Ulman, Village staff added "notes" to the file reflecting the supposed bill.

120.    Zummo further stated that the reason for the disparate treatment Plaintiffs suffered was that Mayor Yagel does not tolerate change and feels threatened by the Orthodox Jewish community moving into the Village.  Zummo said that Yagel would make comments such as "We don't want this element" in reference to Orthodox Jews.

121.    Zummo also told Mr. Manes that Defendant Ulman had directed him to delete email messages from his phone in anticipation that the phone might be searched for documents relevant to discrimination claims.

### 2.    Admissions by Defendants Ulman

122.    On July 19, 2018, Manes had a conversation with Defendant Ulman during a break in a deposition in a separate land use litigation between the Village and TAL Properties.

123.    During that conversation, Ulman admitted to Manes that "certain residents' lives were made miserable by the discriminatory actions of people working for the Village."  She attempted to absolve herself of responsibility by stating that "it's my job to represent Mayor Yagel" – when, in fact, she represents the Village – and by claiming that she eventually resigned from representing the Village zoning board because of its discriminatory treatment of Robert Klein and other Orthodox Jewish residents.  These statements were made in front of Mr. Manes and his attorney in the other litigation.

124.    Ulman also admitted that the Village board of trustees improperly targeted Plaintiffs by pursuing a claim that Plaintiffs were responsible for maintaining the roads accessing their properties, when defendants did not make such claims against other similarly-situated, non-Jewish property owners.

125.    The religiously-motivated discrimination to which defendants subjected Plaintiffs stymied Plaintiffs from timely proceeding with other projects and caused actual economic loss. In engaging in the conduct set forth above, defendant Yagel repeatedly consulted with defendant Ulman, an attorney in good standing in the State of New York, shared with her his discriminatory design and enlisted her support in each of the methods he dictated to stymie and impeded Plaintiffs' projects.

126.    Though aware that the impositions placed upon Plaintiffs were contrary to Village law and not authorized by any provision of the local building or zoning codes, defendant Ulman fronted for defendant Yagel, knowingly implementing and defending his discriminatory dictates and impeding Plaintiffs' business venture to delay alienation of the Plaintiff's properties.

127.    As a consequence of the treatment outlined above, Defendants collectively caused Mr. Manes economic losses, as well as emotional distress, anxiety and humiliation.

## FIRST CLAIM FOR RELIEF

**(Violations of the Equal Protection Clause**
**United States Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983)**

128.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

129.     Defendants' actions deprived and continue to deprive all Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution by discriminating against and targeting Plaintiffs for disfavor in, among other things, the application of local zoning laws, and the enforcement of alleged code violations.

130.     Defendants' contemporaneous actions and statements show that Defendants mistreatment of Plaintiffs is motivated by discriminatory animus against Orthodox Jews.

131.     The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

132.     Plaintiffs are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

### SECOND CLAIM FOR RELIEF
**(Violations of the Free Exercise Clause**
**United States Constitution, First Amendment**
**42 U.S.C. § 1983)**

133.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

134.     By targeting Plaintiffs for mistreatment and disfavor because of their religious identity as Orthodox Jews, Defendants have improperly deprived Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment.

135.     The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

136.   Plaintiffs are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

**THIRD CLAIM FOR RELIEF**
**(Violations of New York State Constitution**
**Article 1, §§ 3 and 11)**

137.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

138.   The Defendants, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of the rights of all Plaintiffs under the New York State Constitution, *viz.* Article I, § 3 (freedom of worship; religious liberty) and Article 1 § 11 (equal protection of laws; discrimination in civil rights prohibited).

139.   The Plaintiffs have suffered and continue to suffer damages caused by Defendants' violations of their constitutional rights.

140.   Plaintiffs are entitled to damages in an amount to be determined at trial, as well as injunctive relief to prevent further violations of their constitutional rights, including without limitation an order appointing an independent third party to oversee code inspections and permit applications.

**FOURTH CLAIM FOR RELIEF**
**(Violations of Section 40-c of the New York Civil Rights Law)**

141.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth at length herein.

142.    The Defendants, by their acts, have conspired under color of law and continue to conspire to abridge the rights of all Plaintiffs under Section 40-c(1) and (2) of the New York Civil Rights Law to be free from discrimination on the basis of their religion.

143.    The Plaintiffs shall duly serve notice of this claim on the Attorney General of the State of New York, pursuant to Civil Rights Law § 40-d.

**WHEREFORE,** Plaintiffs respectfully requests that the Court enter judgment in their favor and against Defendants as follows:

(1)    Awarding Plaintiffs compensatory, consequential and punitive damages in an amount to be determined at trial;

(2)    Enjoining Defendants from discriminating against Plaintiffs on the basis of their religion;

(3)    Appointing an independent third party to oversee code inspections and permit applications.

(4)    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(5)    Granting such other and further relief to Plaintiffs as the Court deems just and proper.

Dated: May 22, 2019
        New York, New York

**Respectfully submitted,**
**SCHLAM STONE & DOLAN LLP**

_____
Bradley J. Nash
Samuel L. Butt
26 Broadway
New York, New York 10004
Telephone No.: (212) 344-5400
Fax No.: (212) 344-7677
bnash@schlamstone.com
sbutt@schlamstone.com

*Attorneys for Plaintiffs*