UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TAL PROPERTIES OF POMONA, LLC, and
AVROHOM MANES,

                                       Plaintiffs,

        - against -

VILLAGE OF POMONA, BRETT YAGEL,
MAYOR OF THE VILLAGE OF POMONA, and
DORIS ULMAN,

                                       Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 17-CV-2928 (CS)

<u>Appearances</u>:

Bradley J. Nash
Schlam Stone & Dolan LLP
New York, New York
*Counsel for Plaintiffs*

Janine A. Mastellone
John B. Martin
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
White Plains, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is the motion of Plaintiffs TAL Properties of Pomona, LLC, and

Avrohom Manes (collectively, "Plaintiffs") seeking relief from judgment of dismissal and to

reopen this case under Federal Rule of Civil Procedure 60(b).  (Doc. 28.)

I.        **BACKGROUND**

        On March 16, 2017, Plaintiffs filed this action in state court, and on April 21, 2017,

Defendants Village of Pomona, Brett Yagel, and Doris Ulman (collectively, "Defendants")

removed the action to this Court. (Doc. 1.)[1]  On July 5, 2017, Plaintiffs requested and obtained

leave to file an Amended Complaint. (Docs. 10-11.)[2]  Defendants requested a pre-motion

conference in advance of a motion to dismiss, and at the conference, the Court granted Plaintiffs

leave to file a Second Amended Complaint, (Minute Entry dated August 25, 2017), which

Plaintiffs filed on September 7, 2017, (SAC).

A.    **Plaintiffs' SAC**

Plaintiffs alleged in the SAC that Defendants selectively enforced certain building codes

and regulations against them based on the religion of Plaintiff Manes, who is also the principal of

Plaintiff TAL Properties, LLC. (*See id.* ¶¶ 12, 48.)  Plaintiffs further alleged that Defendants

burdened Plaintiffs' free exercise of religion by imposing harsher conditions on them than it did

on non-Jewish building developers. (*Id.* ¶ 49.)  In support they allege as follows.

Plaintiffs purchased a residential home at 22 High Mountain Road within the Village (the

"Property") in December 2015. (*Id.* ¶ 8.)  In January 2016, Plaintiffs made repairs to the

Property, and Village Building Inspector Louis Zummo inspected it and advised Plaintiffs that

the repairs were done in accordance with applicable building codes and regulations. (*Id.*

¶¶ 9-11.)  Despite Plaintiffs' compliance, and despite Zummo's comments that a certificate of

occupancy ("CO") would be issued, Defendants Yagel and Ulman directed Zummo to not issue

the CO. (*Id.* ¶¶ 11, 13.)  In seeking to justify the Village's refusal to issue the CO, Yagel, acting

by and through Ulman, claimed that a prior owner of the Property owed the Village $6,379.34,

---

[1] Plaintiffs brought their state court action against Defendants and against Ian Banks, Alma Sanders Roman, Nicholas Wilson, Louis Zummo, and P. Joseph Corless, who were all associated with the Village of Pomona (the "Village").  But Plaintiffs dropped these individuals as Defendants in their Second Amended Complaint. (*See* Doc. 16 ("SAC").)

[2] Although the proposed Amended Complaint was attached to Plaintiffs' letter requesting leave, it was never filed.

and Ulman demanded payment from Plaintiffs in exchange for the CO. (*Id.* ¶ 16.) The Village generally does not refuse to provide a CO because a prior property owner failed to satisfy a debt that the Village failed to record as a lien against the property at the time the current owner purchased that property. (*Id.* ¶¶ 18-19.) Further, Yagel and Ulman did not collect or attempt to collect the debt from the Property's previous owner, who was not Jewish. (*Id.* ¶ 21.)

In the summer of 2016, Plaintiffs sought to grade out slopes on the Property and submitted a grading plan. (*Id.* ¶¶ 23-24.) The Village engineer initially approved it, but under pressure from Yagel and Ulman, retracted his approval and stated that costly measures needed to be undertaken before the grading could begin – measures that "similarly-situated property owners did not have to satisfy." (*Id.* ¶ 29; *see id.* ¶¶ 23-25, 30-32.)

After Plaintiffs agreed to comply with the costly requirements imposed by Defendants, the Village still rejected Plaintiffs' application and did not issue a permit for the grading work. (*Id.* ¶ 33.) Plaintiffs allege that Zummo and the Village clerk, whom they later identified as Noreen Shea, (*see* Doc. 52 ("TAC") ¶¶ 16, 93), told Manes that Yagel and Ulman advised them to give Plaintiffs "a hard time with anything they needed." (SAC ¶ 35.) Zummo also allegedly told the Village engineer that Zummo would "no longer participate in selective enforcement against the plaintiffs." (*Id.* ¶ 28.)

In the fall of 2016, Plaintiffs entered into a contract for the Property's sale, but at a lower price than if the grading work had been done. (*See id.* ¶¶ 34, 36-37.) By this time, the Village had dropped any claim that Plaintiffs owed fees incurred by the prior owner and had issued Plaintiffs a CO. (*Id.* ¶ 38.) Following the sale of the Property, however, the Village allegedly threatened to withdraw the CO unless Plaintiffs signed an agreement acknowledging, among other things, that the road accessing the Property was not a Village road and that maintenance of

the road was the sole responsibility of the Property owner.  (*Id.* ¶ 39.)  Plaintiffs allege that the Village did not require other property owners to sign similar agreements.  (*See id.* ¶ 40.)

**B.**    **Defendants' Motion to Dismiss**

On October 16, 2017, Defendants moved to dismiss Plaintiffs' SAC.  (Doc. 17.)  On January 10, 2018, I granted Defendants' motion.  (Minute Entry dated Jan. 10, 2018; Doc. 24.)  Regarding Plaintiffs' selective enforcement claim under the Equal Protection Clause, Plaintiffs failed to plausibly allege that they, compared with others similarly situated, were selectively treated, and even if they were selectively treated, that such treatment was based on Manes's religion.  Specifically, Plaintiffs' allegations regarding similarly situated persons were conclusory, as Plaintiffs did not allege that the previous owner of 22 High Mountain Road ever applied for a CO or that other property owners on High Mountain Road ever applied for or were granted grading permits like the one Plaintiffs sought.  Ultimately, Plaintiffs provided no facts about the comparators' properties or activities from which I could infer that others were similarly situated to Plaintiffs but treated better in their interactions with Defendants.  Plaintiffs also failed to plead that any selective enforcement was motivated by religious-based animus.  Plaintiffs had to do more than allege that Defendants knew Manes was Jewish and treated him badly, and in their SAC, Plaintiffs failed to provide facts supporting even circumstantially a conclusion of discriminatory intent.

I also dismissed Plaintiffs' free exercise claim on the ground that Plaintiffs' conclusory allegations of religious-based animus were insufficient to establish a First Amendment violation.  Further, Plaintiffs failed to plausibly allege that the conditions and requirements imposed by Defendants substantially burdened Plaintiffs' religious freedom or interfered with their religious

observation.  Plaintiffs made a single allegation that their religious freedom was burdened, but it was not only conclusory but did not even claim that the burden was a substantial one.

Accordingly, I granted Defendants' motion, and on January 12, 2018, judgment was entered in favor of Defendants, and the case was closed.  (Doc. 25.)  No appeal was taken.

**C.**     **The New York State Division of Human Rights Report**

On November 3, 2017, Noreen Shea, a non-Jewish former Deputy Village Clerk, filed a complaint with the New York State Division of Human Rights, alleging that she was unlawfully terminated for providing competent, equal, and professional services to Orthodox Jewish investors, builders, and residents, and for being too cooperative with certain Jewish residents of the Village.  (Doc. 30 ("Manes Decl.") Ex. 2 ("Human Rights Complaint") ¶ 11.)  A non-public investigation followed, during which Shea, in response to the Village's position, provided a more detailed account of the discrimination she witnessed.  (*Id.* Ex. 3 ("Response").).  In June 2018, six months after this Court dismissed Plaintiffs' SAC, the New York State Division of Human Rights issued a report of its findings.  (Manes Decl. Ex. 1 ("the "Human Rights Report" or the "Report") at 1, 8; *see* TAC ¶ 46.)  The Report included Shea's allegations that she was labeled as a "Jew Lover," (Report at 1, 5; *see* Response at 21), describing an "Us vs. Them" culture in the Village offices with respect to Orthodox Jewish residents, (Report at 1; Human Rights Complaint ¶ 10; Response at 34), and stating that Yagel often referred to Orthodox Jews as "them" or "those people" and told her to stop being "too cooperative" with Jewish residents, (*see* Report at 1, 5; Response at 13, 22; Human Rights Complaint ¶ 5).  Shea's submissions added that Yagel chastised her for being pleasant to Manes, (Human Rights Complaint ¶ 5; *see* TAC ¶ 48), and that the Village Clerk told Shea to "not be so polite or kind to Tal Properties owner, Mr. Avorhom [*sic*] Manes because he had three law suits against the Village," (Response at 26).

Shea alleged that Zummo and Ulman unfairly delayed in issuing a permit to the Orthodox family that had bought 22 High Mountain Road and wanted to convert a garage into rooms for two handicapped children, and that Zummo commented, "[M]aybe he should stop having children." (Response at 16-17.) Shea also asserted that Yagel yelled at her for too quickly arranging an inspection for another Jewish property owner. (*Id.* at 32.) Further, Shea alleged that Yagel instructed her to buy pork rinds and place them on the counter in the Village office "as a deterrence against the growing Orthodox Jewish population." (Report at 1; *see* Human Rights Complaint ¶ 8; *see also* Response at 33 (alleging that Yagel instructed Shea's supervisor to buy and display pork rinds).)

Defendants also allegedly criticized Shea for responding too quickly to Freedom of Information Law ("FOIL") requests from Orthodox Jewish residents. (*See* Human Rights Complaint ¶¶ 4-5.) Yagel instructed Shea that she could wait until the last permissible date (which was five days after the request) to provide information to Jewish residents and developers. (*See* Response at 22.) The Report noted that a Village trustee said Shea sent two internal memoranda while working for the Village stating that the Village's "building files were in disarray" and she was not trained on how to access the files. (*See* Report at 5.)

During the investigation, the Human Rights Division interviewed numerous Village employees, including Defendant Yagel and Zummo. (*Id.* at 2.) Yagel denied all of Shea's allegations. (*Id.* at 2-3.) He admitted only that he told Shea, "Don't you know we are in litigation?" after observing her interacting with "someone from Tal Properties." (*Id.* at 2.) Zummo denied most of Shea's allegations, but he admitted that Yagel had once directed him to work "during the weekend 'to do garbage,'" (*id.* at 3-4), possibly a reference to Shea's allegation that the Village engaged in "selective ticketing of Jewish residences related to their garbage

cans," (*id.* at 2). Zummo further "acknowledged that he had done impressions/impersonations in the office of Jewish residents and said that he 'joked about how people were carrying on.'" (*Id.* at 4.) The investigator also reviewed emails in which Yagel directed Zummo to issue a violation to an unidentified property and to issue an immediate stop work order to an unidentified individual. (*Id.*)

At the conclusion of the investigation, the investigator recommended a hearing to "determine whether [Shea's] refusal to engage in unlawful discriminatory practices toward Jewish residents was the motivating factor behind [the Village's] refusal to reappoint her as Deputy Clerk." (*Id.* at 8.) The Report concluded that there was "probable cause to support the allegations of the complaint," (*id.*), but its author explained that he was required to resolve all factual disputes in favor of Shea, and "[a] determination of probable cause is not a final adjudication, but merely a determination that there should be a formal hearing on the matter," (*id*).

D. **Additional Lawsuits Stemming from Defendants' Alleged Discriminatory Conduct**

Instead of proceeding via public hearing, Shea elected to pursue her claims in this Court. *See Shea v. Village of Pomona*, No. 18-CV-11170 (CS), (S.D.N.Y. Dec. 13, 2018), Doc. 8. Additionally, on November 2, 2018, three additional Jewish residents of Pomona – Samuel Indig, Meir Kahana, and Robert Klein – filed a complaint against the Defendants here (and Zummo and Deputy Mayor Leon Harris), bringing claims for, among other things, equal protection and free exercise violations. *See Indig v. Village of Pomona*, No. 18-CV-10204 (VB) (S.D.N.Y. Nov. 2, 2018), Doc. 1 ("Indig Complaint") ¶¶ 98-106; Manes Decl. Ex. 5. The *Indig* plaintiffs alleged that Defendants

employed a range of discriminatory techniques to achieve their unlawful agenda – 1) enacting unconstitutional new zoning laws and practices; 2) pretextual delays

and denials of permits and certificates of occupancy to Jewish homeowners and developers; 3) harassing real estate brokers (and their customers) known for selling to Orthodox clients; 4) targeting Jewish-owned residences for selective enforcement of code violations – for example, executing pre-dawn Saturday morning ticketing blitzes (referred to by Yagel as "shul patrols"); and 5) accepting and encouraging deranged and blatantly anti-[S]emitic "complaints" from non-Jewish residents as legitimate justifications for intrusive inspections and harassment (*e.g.*, complaints referring to Orthodox Jews as "Corporation members" and prayer groups as business meetings and "the people living on the hill").

(Manes Decl. Ex. 5 ¶ 8.)

### E. Plaintiffs' Motion to Reopen and Proposed Third Amended Complaint

On November 2, 2018, Plaintiffs moved to vacate the judgment of dismissal and reopen this case pursuant to Federal Rule of Civil Procedure 60(b). (Doc. 28). Plaintiffs filed a memorandum in support of their motion, (Doc. 29 ("Ps' Mem.")), and supplied with that motion three declarations and numerous exhibits, (Docs. 30-32). Defendants filed an opposition brief, (Doc. 35 ("Ds' Opp.")), and Plaintiffs filed a reply, (Doc. 40 ("Ps' Reply")). On April 30, 2019, the Court ordered Plaintiffs to file a proposed Third Amended Complaint, (Doc. 44), which Plaintiffs did on May 29, 2019, (TAC).

In their TAC, Plaintiffs set forth many of the facts asserted by Shea in her Human Rights Complaint and by plaintiffs in the Indig Complaint. For example, Plaintiffs allege that Defendants fostered an "Us vs. Them" culture, (TAC ¶ 48), Yagel criticized Shea for complying too quickly with FOIL requests from Jewish residents, (*id*. ¶ 51), Yagel called Shea "Jew Lover," (*id*. ¶ 53), and Defendants refused to permit an Orthodox Jewish family to build accommodations for their children with disabilities, (*id*. ¶ 56) – all of which were alleged in Shea's Human Rights Complaint and Response, (Report at 1, Human Rights Complaint ¶ 10; Response at 17, 34). Further, Plaintiffs alleged that Defendants targeted Jewish residents via overnight enforcement, referred to as "shul patrols," (TAC ¶¶ 58, 60), which was similarly alleged in the Indig Complaint, (Manes Decl. Ex. 5 ¶ 8).

Plaintiffs also made new allegations not previously alleged in the Human Rights or Indig

Complaints. First, Plaintiffs alleged that following the release of the Human Rights Report,

Zummo had several conversations with Manes during which Zummo allegedly admitted that

Defendants discriminated against Plaintiffs on the basis of Manes's religion. (TAC ¶ 118.)

Zummo allegedly admitted that Yagel would make comments such as "We don't want this

element," in reference to Orthodox Jews, (*id.* ¶ 120), and that Yagel and Ulman intentionally

caused delays in the issuance of a CO for the Property by imposing requirements that were not

applied to other non-Jewish property owners, (*id.* ¶ 119). Further, Zummo allegedly stated that

Ulman altered the file for the Property by adding "notes" regarding the alleged debt on the

Property, (*id.*), and admitted that the Village's building files were in disarray and that the files

stored in the basement of the Village office were not searched in response to FOIL requests, (*id.*

¶ 112). According to Plaintiffs, Zummo stated that the slope-related documents regarding the

Property were missing, as were files necessary to show comparators elsewhere on High

Mountain Road or nearby streets. (*Id.*)

Second, Plaintiffs state that on July 19, 2018, Manes had a conversation with Ulman

during a break in a deposition in a separate land-use case, and during the conversation, Ulman

allegedly admitted that "certain residents' lives were made miserable by the discriminatory

actions of people working for the Village." (*Id.* ¶¶ 122-123.) Plaintiffs assert that Ulman

attempted to absolve herself of responsibility by stating, "[I]t's my job to represent Mayor

Yagel" – when, in fact, she represents the Village – and by claiming that she eventually resigned

from representing the Village zoning board because of its discriminatory treatment of Orthodox

Jewish residents. (*Id.* ¶ 123; *see id.* ¶ 57.) Ulman also allegedly admitted that "the Village board

of trustees improperly targeted Plaintiffs by pursuing a claim that Plaintiffs were responsible for

maintaining the roads accessing their properties, when Defendants did not make such claims against other similarly-situated, non-Jewish property owners."  (*Id.* ¶ 124.)

Plaintiffs' TAC asserts that the Defendants' actions violated (1) the Equal Protection Clause of the Fourteenth Amendment; (2) the Free Exercise Clause of the First Amendment; (3) the New York State Constitution article 1; and (4) section 40-c of the New York Civil Rights Law.  (*Id.* ¶¶ 128-143.)

## II.　　LEGAL STANDARD

Rule 60(b) provides that a court may, in its discretion, relieve a party "from a final judgment, order, or proceeding for the following reasons:  . . . (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)" or "(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."  Fed. R. Civ. P. 60(b).  Rule 60(b)(2) and 60(b)(3) motions must be made "no more than a year after the entry of the judgment or order or the date of the proceeding."  Fed. R. Civ. P. 60(c)(1).

Rule 60 is intended to preserve "a balance between serving the ends of justice and ensuring that litigation reaches an end within a finite period of time."  *Am. Tissue, Inc. v. Arthur Andersen L.L.P.*, No. 02-CV-7751, 2005 WL 712201, at *2 (S.D.N.Y. Mar. 28, 2005) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1144 (2d Cir. 1994)).  In striking this balance, a motion for relief from judgment is generally disfavored and granted only when "exceptional circumstances" exist.  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001).  The party seeking relief from the prior judgment has the burden of proof, *id.*, and that party "must meet an 'onerous standard,'" *Vector Capital Corp. v. Ness Techs., Inc.*, No. 11-CV-6259, 2012 WL 1948822, at *10 (S.D.N.Y. May 24, 2012) (quoting *Int'l Bhd. of Teamsters*, 247 F.3d

at 392).  Rule 60 "is 'not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.'" *Edwards v. Rochester Inst. of Tech.*, No. 10-CV-6553, 2018 WL 3017094, at *1 (W.D.N.Y. June 18, 2018) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), *as amended* (July 13, 2012)), *appeal docketed*, No. 18-2031 (2d Cir. July 10, 2018).

## III.  DISCUSSION

### A.  Timeliness

Before addressing the merits of Plaintiffs' motion, I address Defendants' assertion that Plaintiffs' Rule 60(b) motion must be denied because it is untimely.  Defendants argue that even though the motion was brought within the one-year limitations period in Rule 60, it must be denied because Plaintiffs failed to file within a reasonable time after obtaining the evidence that forms the basis of their motion, and offer no explanation for that delay.  (Ds' Opp. at 8-9.) Specifically, Defendants allege that Plaintiffs should not have waited five months after the release of the Human Rights Report, (*id.* at 9), while Plaintiffs argue that their motion is timely because it was filed within a year of dismissal, and they did not unreasonably delay after receiving the new evidence, (Ps' Reply at 9).  Plaintiffs state that they did not receive the full record until less than four months before filing the motion and that the delay represents the time it took Plaintiffs' counsel to review and analyze the Human Rights Report and the documents on which the investigator relied in preparing the Report.  (*Id.*).

Plaintiffs' motion is timely under Rule 60(c)(1).  While Defendants cite to some cases in which courts have denied Rule 60 motions on timeliness grounds, none of them are analogous to the facts here.  In *Hamzik v. Zale Corp./Del., Inc.*, the plaintiff did not state when he located the newly discovered evidence and in fact possessed it prior to judgment but assumed the evidence

was lost or destroyed.  *See* No. 06-CV-1300, 2008 WL 2073957, at *1-2 (N.D.N.Y. May 14, 2008).  In *Henriquez v. Astrue*, the plaintiff possessed the newly discovered evidence prior to judgment, could not explain why she did not tell her lawyer about it, and could not explain why, once the lawyer was informed of the evidence, the lawyer did not move within the ten-day period for a Rule 59 motion.  *See* 499 F. Supp. 2d 55, 56 (D. Mass. 2007).  The facts here are simply not analogous, and in any event, those cases are not binding on this Court.  Plaintiffs moved with reasonable diligence after obtaining the new evidence.  Accordingly, I will not deny Plaintiffs' motion on timeliness grounds.

**B.**      **Rule 60(b)(2)**

Rule 60(b)(2) allows a court, in its discretion, to relieve a party from a final judgment or order based on "newly discovered evidence that, with reasonable diligence, could not have been discovered" within twenty-eights days of entry of judgment.  Fed R. Civ. P. 60(b)(2).  For a Rule 60(b)(2) motion to succeed,

> the movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*Int'l Bhd. of Teamsters*, 247 F.3d at 392 (internal quotation marks omitted) (alteration omitted).  Therefore, if the movant possessed or could have possessed the evidence before judgment was rendered, it is not newly discovered and does not entitle the movant to relief from judgment.  *See Kurzweil v. Philip Morris Cos.*, No. 94-CV-2373, 1997 WL 167043, at *4 (S.D.N.Y. Apr. 9, 1997).

The *International Brotherhood of Teamsters* factors were "written primarily with an eye towards judgments that have been entered following a trial or other factual hearing, but they have also been applied to relieve a party from a judgment entered without a trial."  *Stage Presence*

*Inc. v. Genveve Int'l Corp.* (*In re Stage Presence Inc.*), No. 12-CV-10525, 2016 WL 3582650, at

*4 (Bankr. S.D.N.Y. June 24, 2016). Where a dismissal was based on a deficiency in a pleading,

the Court must determine whether the new evidence would have changed the prior outcome –

*i.e.*, whether its inclusion would have altered the order on the motion to dismiss.[3] *See id.* at *5;

*Kurzweil*, 1997 WL 167043, at *5.

Plaintiffs argue that the "evidence newly-revealed in the Human Rights Report – and . . .

additional witnesses who came forward in its wake – meet[] each of the prerequisites for a Rule

60(b)(2) motion." (Ps' Mem. at 16.) Plaintiffs first argue that the Human Rights Report

revealed evidence of discrimination against Jewish residents of Pomona that existed at the time

their SAC was dismissed. (*Id.*) Defendants do not dispute this assertion, so Plaintiffs have

satisfied the first factor above.[4]

---

[3] Defendants repeatedly point out that Plaintiffs' newly discovered evidence is not admissible. (D's Opp. at 6, 9-12) Some of it is – such as admissions of Village employees and statements not offered for their truth. More fundamentally, the inquiry on a Rule 60(b)(2) motion is whether the evidence would have changed the outcome, and when the outcome is the granting of a motion to dismiss, that inquiry requires analysis of whether the newly discovered evidence would have allowed Plaintiffs to plausibly plead their claims, not prove them. *See Stage Presence*, 2016 WL 3582650, at *5 ("The relevant question in this case is not whether the new evidence would result in a 'win' at a subsequent trial, but whether the new evidence would have altered the prior outcome – that is, whether its inclusion in a pleading would have . . . altered the dismissal order.").

[4] Plaintiff Manes in his declaration describes "additional acts of discrimination" he experienced "beyond those set forth in the [SAC]," (Manes Decl. ¶ 9), that occurred between December 2017 and November 2018, (*id.* ¶¶ 10-14). These events are irrelevant. To the extent these events occurred after the motion to dismiss was granted, evidence of them "is not newly discovered evidence that was in existence at the time of the order; it is simply new evidence." *Kurzweil*, 1997 WL 167043, at *5 (emphasis omitted). To the extent these events occurred before the motion to dismiss was granted, Plaintiff was aware of them and they are thus not newly discovered. *See id.* at *4.

The parties dispute whether Plaintiffs were justifiably ignorant of the newly discovered

evidence,[5] but even assuming they were, Plaintiffs fail to establish that the evidence would be of

---

[5] Plaintiffs argue that "because the Human Rights Report was not issued until June 4, 2018, Plaintiffs were necessarily 'justifiably ignorant' of these facts before the Order and Judgment were entered on January 10 and 12, 2018." (Ps' Mem. at 16.)  It is important to distinguish, however, between the newly discovered facts contained in the Report and those facts that were asserted in Shea's Human Rights Complaint and Response.  A large portion of the Report, and indeed those parts that Plaintiffs assert are the most helpful to their motion, are simply recitations of allegations that Shea made in her Human Rights Complaint and Response. The only fact in the Report that came from someone or something other than Shea that directly involves Plaintiffs is that Yagel admitted that, after seeing Shea interacting with "someone from Tal Properties," he asked her, "Don't you know we are in litigation?"  (Report at 2.)  This innocuous admission hardly advances Plaintiffs' cause.  The Report also found that Yagel instructed Zummo to "violate" an unidentified property (which Plaintiffs do not claim was the Property) and to issue a stop work order to an unidentified resident (who Plaintiffs do not claim was Manes), and that non-Defendant Zummo admitted that he impersonated Jewish residents and joked about how they "carri[ed] on," (*see id.* at 4).

Accordingly, nearly all of the newly discovered evidence on which Plaintiffs rely here is contained in Shea's Human Rights Complaint and Response.  And to satisfy the second prong of Rule 60(b)(2) as discussed above, Plaintiffs must establish that they were justifiably ignorant of those facts despite due diligence when they brought their Complaint and SAC.  Plaintiffs' showing on this score is weak, as discussed below.

In Plaintiffs' SAC, they mention that "the village clerk . . . expressly told [Manes] that defendants Yagel and Ullman [*sic*] advised [her] to give plaintiff[s] a hard time with anything they needed."  (SAC ¶ 35.)  Based on the TAC, it is clear that the "village clerk" is Shea. (*Compare* SAC ¶ 35 ( "[T]he village clerk . . . expressly told [Manes] that defendants Yagel and Ullman [*sic*] advised [her] to give plaintiff[s] a hard time with anything they needed."), *with* TAC ¶ 93 ("[T]he Village Clerk, Ms. Shea, . . . expressly told Manes that defendants Yagel and Ulman advised [her] to give Plaintiffs a hard time with anything they needed.").)  (Although Ms. Shea was the Deputy Village Clerk, (Human Rights Complaint ¶ 2), Plaintiffs plainly regarded her as the Village Clerk.)  Accordingly, Plaintiffs had spoken with Shea prior to filing their SAC and at that time knew, or should have known, of the facts Shea alleged in her Human Rights Complaint.  "Even if some of the particular underlying facts that later came out in" Shea's complaint or the Human Rights Report "could be considered 'newly discovered,' it is clear that Plaintiffs were not justifiably ignorant of those facts."  *In re Optionable Sec. Litig.*, No. 07-CV-3753, 2009 WL 1653552, at *4 (S.D.N.Y. June 15, 2009).  While it is true that Shea did not file the Human Rights Complaint until after judgment was entered, she was almost certainly armed with those same allegations when she spoke with Plaintiffs, as Shea filed her Human Rights Complaint less than two months after Plaintiff filed the SAC.  (Human Rights Complaint at 3.) When drafting their SAC, Plaintiffs were apparently satisfied with the evidence that Shea provided to them, and instead of pressing her for more facts, "Plaintiffs chose to file on

such importance that it probably would have changed the outcome. None of the newly discovered evidence cures the deficiencies that resulted in dismissal of the SAC. In their SAC, Plaintiffs failed to identify any comparators that were similarly situated but treated better in their interactions with Defendants, which warranted dismissal. *See New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*, No. 15-CV-2433, 2016 WL 8653493, at *21 (E.D.N.Y. Mar. 19, 2016) (dismissing equal protection claim under either selective enforcement or class-of-one theories where plaintiff neither identified a similarly situated restaurant nor offered "any non-conclusory allegations suggesting that all of the [neighboring] restaurants . . . were similarly situated to [plaintiff-restaurant] in all material respects"), *aff'd*, 674 F. App'x 23 (2d Cir. 2016) (summary order); *Segreto v. Town of Islip*, No. 12-CV-1961, 2014 WL 737531, at *7 (E.D.N.Y. Feb. 24, 2014) (vague assertions regarding neighbors insufficient where no allegations that they received permits denied to plaintiff and unclear whether properties similar); *Parkash v. Town of Southeast*, No. 10-CV-8098, 2011 WL 5142669, at *8 (S.D.N.Y. Sept. 30, 2011) ("conclusory reference to unspecified similarly situated persons without accompanying examples" insufficient to state selective enforcement claims), *aff'd*, 468 F. App'x 80 (2d Cir. 2012) (summary order); *cf.*

---

insufficient allegations." *In re Optionable Sec. Litig.*, 2009 WL 1653552, at *4 ("Plaintiffs knew of the investigations, but instead of waiting for more facts to emerge – or even requesting from [the court] more time to amend the complaint – Plaintiffs chose to file on insufficient allegations, perhaps to gain a tactical advantage."). Plaintiffs do not allege that Shea refused to speak further or that they were unable to seek more information from her.

The remaining "newly discovered evidence" contains statements made by Zummo and Ulman in post-judgment conversations with Manes, and allegations brought by other Jewish residents of Pomona in the Indig Complaint. Plaintiffs do not allege that they were unable to speak with Zummo, Ulman, or the Indig Complaint plaintiffs prior to filing their Complaint, or that those individuals were previously unwilling to share information with Plaintiffs. In any event, I need not decide whether the evidence on which Plaintiffs rely was newly discovered, because (as discussed below) none of it would have changed the outcome of this Court's previous Opinion and Order.

*Whittle v. County of Sullivan*, No. 16-CV-725, 2017 WL 5197154, at *7-8 (S.D.N.Y. Nov. 8, 2017) (allegations of similarly situated comparator inadequate in employment discrimination case where "Plaintiff fail[ed] to provide facts as to which colleagues committed similar acts but were not fired, what those acts were, to whom those employees reported, what their responsibilities were, and how their disciplinary histories compared to his").  Plaintiffs also failed to state a plausible free exercise claim because they failed to allege a burden on their religious freedom, let alone a substantial one.  *See Skoros v. City of N.Y.*, 437 F.3d 1, 39 (2d Cir. 2006) ("Absent [a showing that the purpose of a challenged action was to impugn religious beliefs or restrict religious practices], a Free Exercise claim will be sustained only if the government has placed a substantial burden on the observation of a central religious belief, without a compelling governmental interest justifying the burden.") (internal quotation marks and alteration omitted).

Despite all of the newly discovered evidence that Plaintiffs proffer, they still have not identified any similarly situated comparators or any substantial burdens on their free exercise of religion.  In fact, Plaintiffs do not argue that the newly discovered evidence would have changed my mind as to whether Plaintiffs adequately pleaded similarly situated comparators or a substantial burden on religious freedoms.  Rather, Plaintiffs argue that the newly discovered evidence would give rise to an equal protection claim under a different theory of liability altogether:  a *Pyke* claim.[6]  But, as discussed above, Rule 60 "is not a vehicle for . . . presenting

_____

[6] There is a "difference between . . . [a] *Pyke* claim, which sounds in racially discriminatory treatment, and [a] *LeClair* claim of 'selective enforcement.'" *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 557 (S.D.N.Y. 2006).  To plead a claim under *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001), plaintiffs must allege "defendants applied a facially neutral law or policy to them in an intentionally discriminatory race-based manner."  *Doe*, 462 F. Supp. at 543.  Under a *Pyke* theory, "discriminatory effects are either independently

the case under new theories." *Edwards*, 2018 WL 3017094, at *1 (internal quotation marks

omitted); *see Walker v. Carter*, No. 12-CV-5384, 2017 WL 3641707, at *2 (S.D.N.Y. July 12,

2017) ("a motion for reconsideration is not the appropriate time to test new legal theories"), *aff'd*

*sub nom. Walker v. Burke*, 739 F. App'x 72 (2d Cir. 2018) (summary order); *Winding v. Wells*

*Fargo Bank*, No. 11-CV-00555, 2012 WL 603217, at *9 (E.D. Cal. Feb. 23, 2012) (denying

relief under Rule 60(b)(2) because plaintiff's "seizure upon a new theory to amend his complaint

does not alter the circumstances under which the complaint was dismissed"), *report and*

*recommendation adopted*, 2012 WL 4468430 (E.D. Cal. Sept. 26, 2012), *aff'd sub nom. Winding*

*v. Wells Fargo Bank, NA*, 706 F. App'x 918 (9th Cir. 2017). Accordingly, while Plaintiffs may

be able to initiate a separate action under their new theory, they have failed to establish the third

element of a Rule 60(b)(2) motion, and I deny Plaintiffs' motion to vacate my previous judgment

or reopen the case under that Rule.

### C.     Rule 60(b)(3)

Plaintiffs argue that the Court should grant them relief from judgment under Rule

60(b)(3) based on Defendants' failure to provide public land and building records in response to

Plaintiffs' FOIL requests, which they claim prevented them from gathering information on

potential comparators. (Ps' Mem. at 20.) Plaintiffs assert that they submitted FOIL requests for

_____

demonstrated or can readily be presumed," and therefore "plaintiffs are not obligated to identify
a better treated, similarly situated group of individuals of a different race in order to establish a
claim of denial of equal protection." *Id.* To plead a "selective enforcement claim" under *Le
Clair v. Saunders*, 627 F.2d 606 (2d Cir.1980), plaintiffs must allege "that they were treated
differently than an identifiable, similarly situated group of individuals for malicious reasons,
including but not limited to racial prejudice." *Doe*, 462 F. Supp. at 543. The same set of facts
may establish a *Pyke* claim while not giving rise to a selective enforcement claim. *See id.* at 543-
44 (finding Plaintiff established a *Pyke* claim but failed to make out a selective enforcement
claim). Plaintiffs in their SAC explicitly denominated their due process claim as one for
selective enforcement. (*See* SAC ¶ 48 (alleging Defendants violated Fourteenth Amendment
"[b]y intentionally engaging in selective enforcement against plaintiff[s].")

these records, but after multiple delays, were told that no files existed or that the relevant records were missing from the file. (*Id.* at 21.)

Rule 60(b)(3) provides that a court may grant relief from judgment for "fraud . . . , misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). The movant must demonstrate by clear and convincing evidence that the non-movant engaged in fraud, misrepresentation, or misconduct and that the conduct in question prevented him from "fully and fairly presenting his case." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309, 312 (S.D.N.Y. 2003) (internal quotation marks omitted). A Rule 60(b)(3) motion is not an opportunity for the movant to attempt to relitigate the merits of the case. *Id.*

The movant need only show that the non-movant's misconduct "substantially interfered" with the movant's ability to present his case, not that the outcome would have been different absent the misconduct. *Id.* at 316. "Substantial interference is established if a party shows that the concealment precluded inquiry into a plausible theory of liability, denied it access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." *Thomas v. City of N.Y.*, 293 F.R.D. 498, 504 (S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd sub nom. Thomas v. McAullife*, 691 F. App'x 671 (2d Cir. 2017) (summary order). Failure to disclose or produce requested materials in discovery can constitute misconduct, and such a failure does not need to rise to the level of nefarious intent; even accidental omissions may be sufficient. *Catskill Dev.*, 286 F. Supp. 2d at 314-15.[7]

---

[7] Defendants assert that "[t]he movant must prove that the opposing party's conduct amounted to fraud or comparably egregious conduct, not mere missteps," and support the proposition with a four-case string cite. (Ds' Opp. at 7.) But none of those cases support that proposition (or even come close). In fact, one of the cases that Defendants cite on the same page

But there was no failure to provide discovery here, as the case was dismissed before any discovery occurred.  Plaintiffs are thus left to argue that conduct occurring outside the scope of litigation, and in fact before any complaint was filed, should be treated like a discovery violation.  They provide no authority for that position and the Court has found none.  Thus, while inept or accidental discovery violations could suffice under Rule 60(b)(3), *see Catskill Dev.*, 286 F. Supp. 2d at 314, it does not appear that other inept or accidental conduct – such as maintaining files in disarray – would suffice.

And that is all Plaintiff can really allege here.  While it is reprehensible if Shea was encouraged to wait until the fifth day to respond to FOIL requests that she could have fulfilled on the spot, it cannot be said that that short delay substantially impeded Plaintiffs' ability to present their case.  And while Plaintiffs allege that files stored in the basement of the Village Hall were not searched in response to FOIL requests, their own evidence shows that the property records they sought were not stored in the basement but rather were upstairs.  (Doc. 31. ¶ 5 ("All the property files were right next to my desk upstairs.").)  So Plaintiffs have also not shown that the failure to search the basement could have substantially impaired their ability to proceed.

That leaves the maintenance of the building files in disarray.  I am not prepared to find that mere negligent maintenance of files (and perhaps the negligent failure to correct that situation) – as opposed to negligence in responding to a request – amounts to "misconduct" within the meaning of Rule 60(b)(3), at least in the absence of authority supporting that notion.  There is simply no clear and convincing evidence of misconduct with regard to the documents Plaintiffs sought.

---

as the string cite referenced above explains that "misconduct under Rule 60(b)(3) can cover even accidental omissions." *Halliburton Energy Servs., Inc. v. NL Indus.*, 618 F. Supp. 2d 614, 640 n.16 (S.D. Tex. 2009) (internal quotation marks omitted).

Nor have Plaintiffs shown, by clear and convincing evidence or otherwise, that any disarray in the property files prevented them from getting what they needed to make their case. They allege that the documents they sought are "missing," (Manes Decl. ¶ 29), but have not specified any record that existed at one time but no longer can be located. For example, they do not allege that the properties at issue, which apparently are situated on the same steep slope as the Property, (*Id.* ¶¶ 22-25), were given permission to grade the slope but the documentation of the same is missing. Indeed, Plaintiffs have not shown that any records exist that would have allowed them to show similarly situated comparators.[8] That may be a difficult showing to make when the Village has stated that it has no such records, but that is the case whenever a Rule 60(b)(3) movant argues that records have been withheld. The cases finding misconduct for withheld records involve the moving party showing that the records exist or existed, *see, e.g.*, *Thomas*, 293 F.R.D. at 504 (withheld items existed); *Catskill Dev.*, 286 F. Supp. 2d at 314 (same); *Monaghan v. SZS 33 Assocs., L.P.*, No. 89-CV-4900, 1992 WL 135821, at *4 (S.D.N.Y. June 1, 1992) (same), but Plaintiffs here have made no such showing, and it is their burden to do so. The motion under Rule 60(b)(3) is therefore denied.

\* \* \*

Defendants should take little comfort in this outcome. The allegations presented on this motion, if even half true, are disturbing. I am obliged to stay within the confines of Rule 60(b),

---

[8] Manes's summary statement that Zummo told him that documents relating to the slope at 22 High Mountain Road or necessary to show comparators were missing does not clearly and convincingly establish that such records existed. Zummo could have meant that the records once existed and were now gone, or he could just have meant that no such records were there. Without more detail about exactly what he said, one cannot conclude with confidence that there were in fact such documents at one time. And even if one could, Zummo said nothing suggesting that such records were deep-sixed or that Shea (who was apparently responsible for responding to FOIL requests) did not search for them in good faith.

which in my judgment does not allow for this lawsuit to be reopened, but should Plaintiffs

commence a new lawsuit, they may well be able to state a claim. And I do not see how

Defendants will "suffer immense prejudice," (Ds' Opp. at 9), if they have to defend themselves

on the merits. They may well be able to do so; I have no opinion as to the what the outcome of

such a case would be, nor could I at this stage. But should Plaintiffs find it in their interest to

pursue a case, airing the allegations and getting to the truth would hardly be a bad thing.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to vacate judgment and reopen the case is

DENIED. Plaintiffs' motion for oral argument is DENIED as moot. The Clerk of the Court is

respectfully directed to terminate the pending motions. (Docs. 28, 43.)

**SO ORDERED.**

Dated: July 22, 2019
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.